[Crim. No. 933. Third Appellate District.—November 27, 1926.]

# THE PEOPLE, Respondent, v. JOHN T. SWIGART, Appellant.

[1] CRIMINAL LAW — MANSLAUGHTER — VERDICT — EVIDENCE — REVIEW OF ALLEGED ERRORS.—In this prosecution for murder which resulted in a conviction of manslaughter, the evidence was sufficient to support the verdict of guilty; and the assignments of certain alleged errors of law are to be reviewed in the light that the verdict is strongly supported evidentially.

[2] ID. — FINDINGS — EVIDENCE — APPEAL — PRESUMPTIONS. — In considering the testimony upon which a finding is predicated, a reviewing court is required to appraise its probative force according to its face value, and, if it be not inherently improbable, so must be accepted as sufficient to support the fact found; and this is true because it is to be presumed on appeal that the jury, who are essentially the weighers of the evidence, accepted such testimony as revealing the truth concerning the issue to which it is addressed.

[3] ID. — SELF-DEFENSE — REPUTATION OF DECEASED FOR PEACE AND QUIET—COMMUNICATED OR UNCOMMUNICATED THREATS—EVIDENCE. In a case of homicide, where the defendant sets up the plea of self-defense, and the question as to which of the two combatants, the defendant or the deceased, was the aggressor, becomes a pertinent and an important issue in the case, it is competent for the defendant not only to show, as tending to prove that the deceased was the aggressor, that the general reputation of the deceased for the quality of peace and quiet was bad, but also that the deceased had made threats, whether communicated or not communicated to the defendant prior to the homicide, to commit physical violence upon the latter.

[4] ID.—PHYSICAL VIOLENCE UPON OTHERS—EVIDENCE—ABSENCE OF PREJUDICE.—In such prosecution, if it was legally improper to exclude testimony of instances in which the deceased had committed acts of physical violence upon persons other than defendant and of which instances the latter had no knowledge prior to the date of the homicide, the rulings foreclosing the right in the defendant to make such proof was entirely without prejudice, where in proving the bad character of the deceased for peace

2. See 8 **Cal. Jur.** 582; 2 **R. C. L.** 193.

3. Evidence of character of deceased in prosecution for homicide, notes, 124 **Am. St. Rep.** 1019, 1023; 2 **L. R. A. (N. S.)** 102; 3 **L. R. A. (N. S.)** 353, 361. See, also, 13 **Cal. Jur.** 693; 13 **R. C. L.** 917.

and quiet and proving that the latter had often threatened to inflict injury upon him the defendant himself disclosed knowledge of facts which, if he was not designedly looking for or seeking trouble with the deceased, should have operated as a sufficient incentive to keep him from the place where the homicide occurred.

[5] Id.—Proximity of Iron Bar to Body of Deceased—Evidence—Argument—Absence of Misconduct on Part of District Attorney.—In such prosecution, the district attorney, in stating to the jury in his argument that an iron bar lying near the dead body of the deceased (which bar the defendant claimed the deceased threatened to use upon him) was placed there by defendant himself and that the testimony in the case showed this fact, did not leave the realms of legitimate argument in the case, where the theory of the prosecution was that the deceased did not at any time have the iron bar in his possession, but that, having gone to the place of the homicide with the intention of meeting the deceased and assaulting and perhaps killing him, the defendant himself, after firing the fatal shot, placed the iron bar near the body of the deceased to be used by him as evidence tending to support a claim by him that, in slaying the deceased, he acted in necessary self-defense, and the circumstances of the case, taken together, afforded reasonable ground for the support of the prosecution's theory.

---

(1) 30 C. J., p. 316, n. 68.    (2) 17 C. J., p. 223, n. 40, p. 254, n. 51, p. 255, n. 52, p. 256, n. 60.    (3) 30 C. J., p. 229, n. 81, p. 237, n. 31½, p. 241, n. 90.    (4) 17 C. J., p. 333, n. 95, p. 335, n. 13. (5) 16 C. J., p. 893, n. 32, p. 894, n. 34, 38, p. 896, n. 85.

APPEAL from a judgment of the Superior Court of Stanislaus County and from an order denying a new trial. L. W. Fulkerth, Judge. Affirmed.

The facts are stated in the opinion of the court.

L. B. Schlingheyde and Hugo McKinley for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant, by an information filed in the superior court of the county of Stanislaus, was charged with and tried for the crime of murder and was convicted by the jury of the crime of manslaughter. The cause has been brought to this court on an appeal from the judgment of

conviction and the order denying the motion of the defend-
ant for a new trial.

The homicide took place in the early morning of the
thirtieth day of July, 1925, on the highway running in front
of and near the Stanislaus County Hospital, said hospital
being situated a short distance from the city of Modesto,
the county seat of said county. The defendant and the de-
ceased, one William Sullivan, were at the time of the fatal
shooting, and had been for some time prior thereto, inmates
of or patients residing at said hospital.

No one, other than the defendant and the deceased, was
present at the scene of the shooting when the homicide
occurred. The defendant was, therefore, the only living
witness to the circumstances immediately attending or sur-
rounding the act of killing. Upon other circumstances, how-
ever—those occurring prior to the date of the fatal meeting
between the parties, together with certain incriminatory
extrajudicial statements made by the defendant before and
after the homicide took place—the People relied for a con-
viction, and which, it is urged here by the People, constitute
an impregnable barrier against just interference on appeal
with the result arrived at below upon the claim by the de-
fendant that, as a matter of law, such result is without suf-
ficient evidentiary support.

The claim the more earnestly urged here by the defendant
is that, even if it were necessary to concede that the verdict
is afforded sufficient evidentiary support, nevertheless the
evidence tending to prove the defendant's guilt is so slight,
or, in other language, the question of guilt is, upon the evi-
dence, so close as to have imparted to the few assigned errors
carried into the court's rulings upon the question of the
admissibility of certain testimony a singularly prejudicial
effect upon the substantial rights of the accused in the trial
of the case.

The record is voluminous and is brought here in two large
typewritten volumes. [1] These we have carefully read
and our conclusion from such reading is that the verdict is
supplied with abundant evidentiary support. Like all
criminal cases in which the People, in making their case, are
compelled, from the intrinsic nature of the situation, to rely
wholly upon the proof of a multiplicity of circumstances of a
varying character, the trial before the court below covered a

wide field or range of inquiry. The exigencies of the case, as it stands before this court, whose function is limited to a determination of the question whether the record under review in all vital respects legally sustains the result reached below, do not require us to enter herein upon an examination of every material circumstance which might have tended to contribute either to the condemnation or the exoneration of the defendant. A general statement of the facts, with a reproduction now and then of brief excerpts from certain portions of certain testimony, will well subserve the purposes of the decision herein.

Sullivan, the deceased, had been an inmate of the county hospital of Stanislaus County for some time prior and down to the date of his tragic death. He was, at the time of the tragedy, past seventy years of age. He was afflicted with rheumatism, which had become chronic with him. His feet, at some time prior to his entrance as a patient into the hospital, had been frozen and for that cause had been amputated "as far up as the instep" of each foot.

The defendant first entered the hospital as an inmate suffering from some heart trouble in the early part of July, 1924. He remained at the hospital until the month of November, 1924, when he took his departure therefrom. He returned, however, a few days before Christmas, 1924, remaining there until the 4th or 5th of June, 1925, when he again left the hospital. After the last-mentioned date— either late in the month of June or early in the month of July—he again entered the hospital as a patient and there remained until the thirtieth day of July, 1925, on which day he shot and killed Sullivan.

Defendant became acquainted with Sullivan when first he (defendant) became an inmate of the hospital in the year 1924, and it seems that it was not long after the two men became acquaintances that a bitter feeling of hostility arose between them. It appears to be well established by the evidence that the genesis of this personal enmity between the two men was in a suspicion conceived by Sullivan that the defendant became an inmate of the hospital not only for the reason that he needed support and medical aid at the expense of the public, but largely for the reason that he (defendant) had been employed by the public authorities to locate in the institution as a detective or a spy with a view of

ascertaining whether intoxicating liquors were being clandestinely furnished the inmates of the hospital by some "bootlegger" or "bootleggers." This suspicion finally and within a short time developed into a positive belief in the deceased that such was the real purpose of the defendant in registering as a patient at the hospital. Here it may be stated that the conclusion arrived at by the deceased that the defendant was being used by someone in authority as a detective for the purpose suggested seems to have been well founded, the defendant having admitted after the homicide occurred that he was a "stool-pigeon" at the hospital for the sheriff to find and report on any illicit liquor traffic which might be carried on with patients at the institution while inmates thereof. Sullivan, however, was a quick and high-tempered man, and when he became convinced that Swigart was acting at the hospital in the role of a detective to run down any "bootlegging" business that might be in operation there, he became very much incensed and embittered against the defendant and lost no time or occasion to denounce him in bitter terms. On nearly every occasion on which the two met (and this was at least once every day), Sullivan would call defendant a "stool-pigeon," always adding force to the offensive signification of that appellation by preceding it with adjectives not to be found in the dictionary. On the return the last time of defendant to the hospital, the deceased, addressing him in opprobrious language, said, in effect: "Why have you returned here? You are a d——n old —— 'stool-pigeon,' nobody here has any use for you"; and so the bickerings of the two old men (defendant was about sixty-eight years of age) continued at frequent intervals and until defendant called on the member of the board of supervisors who issued to him the permit upon the authority of which he (defendant) entered the hospital the last time before the date of the homicide and complained to that official that a "number of old men"—patients—at the hospital were constantly "picking on" and abusing him and threatening to inflict upon him personal injury, and asked the supervisor to cause the said "old men" to be turned out of the hospital. The supervisor promised to investigate and did subsequently cause an investigation of the charge. This investigation was conducted a few days only before the date of the homicide by the superintendent of the hospital and the supervisor re-

ferred to. Both the defendant and the deceased and other inmates of the hospital were called before the officials and closely questioned regarding the trouble and occasion thereof. The details of this investigation it is not necessary to repeat herein. It is enough to say that, after full inquiry into the matter, Sullivan promised the officials to cease quarreling with and abusing the defendant or in any manner molesting him thereafter. There is, however, some testimony to the effect that the deceased, notwithstanding the promise so made, continued to "pick on" and pursue the offensive course toward the defendant that brought about, on the complaint of defendant, the investigation by the supervisor and the superintendent of the hospital.

The deceased was accustomed to rising early in the morning—at 6 o'clock or thereabouts—and taking walks back and forth for short distances along the highway running in front of and bordering upon the hospital grounds. With this custom of the deceased the defendant was familiar.

The defendant was the owner of a revolver and, on returning to the hospital in the early part of July, 1925, carried the weapon with him; but, being acquainted with the rule prohibiting inmates, while such, from carrying or having possession of deadly weapons on the hospital grounds, hid or concealed his revolver near an old creek not far distant from the hospital. He kept the weapon there for several days and then removed it to and concealed it in the branches of a cypress tree standing near the fence separating the hospital premises from the highway. On the night immediately preceding the morning of the tragedy the defendant took the revolver from its place of concealment and "oiled it up," and then placed it in a holster attached to a belt. On the morning of the fatal shooting the defendant saw the deceased in the act of leaving the hospital and going to the highway mentioned above. Within a very short space of time thereafter the defendant, with his revolver on his person, carrying it in the scabbard attached to the belt, which he buckled around his waist between his shirt and vest, also went to the highway. There he met and shot and killed Sullivan, having fired at the latter twice, both shots taking effect in the body of the deceased. Immediately following the fatal shooting the defendant observed a motorist traveling in the direction of the scene of the homicide and signaled

the latter to stop. The motorist paid no heed to the signal, but passed on. Shortly thereafter, one Roy Albertson was driving an automobile from the town of Riverbank toward the city of Modesto, and as he was approaching and not far from the point on the highway where the shooting took place, he saw the defendant in the center of the highway "waving his arms." Albertson, on reaching the spot where the defendant stood, stopped his car. Thereupon the defendant said to Albertson that he (defendant) "had shot a man" and requested Albertson to "go to the hospital and report it." Albertson thereupon drove to the hospital and told a nurse connected with the institution of the shooting, and, at her request, he conveyed her in his auto to the scene of the homicide. The dead body of Sullivan was lying partly on and partly off the paved portion of the road at a point something over one hundred feet from where the defendant stood when he stopped Albertson, as explained. The defendant asked Albertson his name and called his attention to an iron bar lying a few feet from the body of the deceased, saying: "I want you to notice the iron bar lying there. I want to get a square deal out of this." The fact of the killing was promptly communicated to the police office in Modesto and within a very short time thereafter Officer Dingley of the Modesto police force went to the scene of the shooting. The defendant was placed under arrest and his weapon taken from his possession by Dingley. Other parties, including another peace officer, soon followed Dingley to the place where the homicide occurred. The defendant was taken to the county jail and the body of the deceased removed to the morgue by the coroner.

The story of the tragedy as told by the defendant, omitting the details of the feud which had developed between him and the deceased, as briefly given above, and which culminated in the homicide, is: That, as was also his custom, he started to the highway to take a morning walk before breakfast; that, prior to entering the highway, he went to the cypress tree in which he had the night before secreted his revolver and got the weapon and placed the belt to which was attached the scabbard containing the pistol around his waist; that, with the revolver, loaded, thus upon his person, he entered the highway and feeling the effect upon the action of his heart of the walk from the hospital, he took

a seat on a bench on the sidewalk bordering upon the highway in front of the hospital; that, while so resting, the deceased made his appearance around a curve in the highway on the side opposite to that upon which the defendant was sitting; that deceased, in an angry and sarcastic manner, said something to the defendant relative to a "still" which he (deceased) said was being maintained either upon the hospital grounds or on the outside thereof in near proximity thereto, and asked him why he did not investigate it, or words to that effect; that the deceased at the time had a good-sized rock in his left hand and, immediately after making the statement about the "still," removed the rock to his right hand and with the latter threw it at the defendant; that the defendant thereupon quickly arose from his position on the bench and took shelter behind a telephone pole near by; that deceased, all the time approaching the spot where the defendant stood, threw another rock at the latter, and finally drew from his person—apparently, defendant said, somewhere from his trousers—the iron bar already mentioned and continued to walk in the direction of defendant; that the latter drew his revolver and commanded the deceased to stop, otherwise, he told him, he would shoot and kill him; that the deceased, with the iron bar in his hand, threateningly continued approaching the defendant, when the latter fired two shots at the deceased, who, after the first and before the second shot, still moved toward the deceased, although, defendant admitted, there elapsed a very short interval of time between the two shots, not more than a second or two.

The foregoing statement embraces a recital in substance of the facts and circumstances immediately preceding and attending the act of killing as it was told by the defendant to the officers at the scene of the homicide and immediately after it occurred and as substantially they were testified to at the trial by him. This recital excludes, of course, those parts of the statements and the testimony of defendant to the effect that deceased not only started and kept up a systematic abuse of the defendant, but often threatened to inflict upon him bodily injury. At the trial, however, the People, after proving by evidence of circumstances and of the admission of the defendant that the latter slew the deceased, introduced evidence of other extrajudicial statements by the deceased relative to the circumstances leading

to and eventuating in the killing that tended strongly to support the theory of the People that the defendant's crime in taking the life of the accused was nothing short of murder of the first degree. In substantiation of this conclusion reference may be made to the following significant considerations: That the deceased was a man past seventy years of age and so far crippled in the left arm as the result of chronic rheumatism as to make that member practically useless; that both feet, as far up as the instep of each, had been amputated, so that his power of locomotion and consequently his ability to move with alacrity were greatly impaired, if not actually destroyed, of which physical deficiency the defendant was fully cognizant; that the defendant was, according to his own admission, aware of the custom of the deceased, during the years he was a patient and an inmate of the hospital, to take early morning walks for short distances over and along the highway running immediately in front of the hospital grounds; that defendant knew of the bitter feeling of hostility cherished against him by the deceased; that he knew that the deceased was of an irascible, as well as of a pugnacious, nature—a fact which he (defendant) himself proved at the trial; that, knowing all these things, and further knowing that the deceased had gone to the highway on the morning of the homicide, he himself shortly thereafter not only went to the highway, but went there with a loaded revolver which he had never carried on his person while on the hospital premises. All these facts and circumstances stand in the record without contradiction. Indeed, the defense itself introduced evidence tending strongly to show not only that the general reputation of the deceased for peace and quiet was bad, but also that he was very often seized with violent paroxysms of anger and on certain occasions, while in such a mental state, had assaulted certain individuals. The other facts and circumstances to which we have referred were also brought into the record either through the defendant's extrajudicial declarations or his own testimony. But the defendant even went further in the way of incriminatory extrajudicial declarations than as already indicated. On the morning that he killed Sullivan, between a half an hour and an hour after his arrest and incarceration in the county jail, the defendant was interviewed, at said

jail, by the deputy district attorney, Deputy Sheriff Wright, the chief of police of Modesto, and the sheriff of Stanislaus County and questioned concerning the circumstances leading to and ending in the homicide. His statement at that time was written down in longhand by Wright, by the latter immediately thereafter put in typewriting, and the same read to defendant, who, upon such reading, stated that the writing embraced a correct statement of the facts and circumstances of which the killing was the outgrowth as he had given them to said officers. Wright testified that, upon his request, the defendant ''talked slow'' so that he was able to take in longhand the statement ''word for word.'' The statement is as follows:

''I didn't tell anyone that I had a gun. I kept it in my grip. I left the hospital a few days before Thanksgiving, 1924, to go to Fresno. I took the gun with me. I carried it on myself inside my shirt. I got back to the hospital about two days before Christmas. I had the gun with me. Sullivan came to the hospital some time in September, 1924. The nurse found my gun in my coat pocket, overcoat. About a month after I got back, at Christmas time, Mr. Trask took the gun and kept it. I got the gun back from him about the first of May, 1925. I took the gun at this time and hid it in the creek. I have had several quarrels with Sullivan. Sullivan always took a walk in the morning. I watched him from the hospital Monday, the 27th, Tuesday, the 28th, Wednesday, the 29th, take a walk along the highway. On the 29th, I went to the creek and got my gun. I hid it along the cemetery fence. On Thursday, the 30th of July, 1925, I went out early in the morning and met Sullivan. Sullivan was on the south side of that road and I was on the north. Sullivan started to throw rocks at me. I got behind the telegraph pole. He started towards me with a piece of iron. I told him to stop or I would kill him. I didn't tell him I had a gun. He couldn't see it. I had it inside my shirt on my belt. He didn't stop so I shot him. He didn't stop then so I shot him again. I shot two shots just as fast as I could. He fell when I shot the second shot. He never got closer than ten feet to me. It was about twenty minutes before a car came along. I couldn't get him to stop. I got the next car stopped about ten minutes later. A boy

was driving it. I told him to tell the superintendent of the hospital that I had killed this fellow. *I wasn't surprised when I met Sullivan. I expected to meet him. I knew that Sullivan couldn't run. He had his toes froze off and had rheumatism. I could have got away from him but I don't have to run from any man.*"

Gray B. Leet, connected with the Stanislaus County welfare board, testified that he saw and talked with defendant at some time during the day the killing took place. The witness had gone to the county jail to see another prisoner, and as he (the witness) entered the jail, the defendant stepped out of a cell and opened a conversation with the witness. The latter said to the accused: "That is some jam that you have got into killing this old fellow." Defendant replied that he did it to protect himself, and proceeded to describe how the deceased attacked him by throwing rocks at him and following the attack by approaching him in a threatening manner with an iron bar in his hands. Leet then said to the defendant: "I understand that this old fellow, Sullivan, has got both of his feet off. He couldn't show much speed in chasing you. You look pretty healthy—you ought to have been able to get out of the way." The accused answered by saying, "Well, I kicked him off." The witness thereupon said: "You must have been laying for Sullivan, to know just exactly when to get him," to which the defendant replied: "Oh, I've been over by the T. B. ward and for four mornings watching him to see which way he would go. I knew just the way he would go because he went that way every morning." Defendant further stated to Leet that Sullivan and others of the old inmates at the hospital had accused him of being a "stool-pigeon"; that he was not a "stool-pigeon," but a detective.

F. E. Lockridge, a deputy sheriff, testified that, while "taking him to court," he had a conversation with the defendant about the homicide, that he said to the accused: "You have got yourself in a h—ll of a jam," to which the accused replied: "Oh, it's not much trouble." The witness, proceeding, said: "I wouldn't want to be in your place," to which the accused responded: "Well, one of us had to go in the basket. I thought it just as well be him. If you will turn me loose," continued the defendant, "two

or three more of those old s——ns of b——hes out there I'll kill.''

The record contains the testimony of other witnesses giving the details of statements made to or in their presence by the accused after his arrest and prior to his first trial, which involved like incriminatory admissions by the defendant. The testimony of Deputy Sheriff Wright giving the defendant's statement at the county jail and hereinabove reproduced in full, as Wright committed it to writing, was corroborated to some extent by the sheriff, who was present a part of the time only when the statement was being made. In fact, the defendant, when on the stand, while stating that all that was said by him on the occasion that Wright wrote out his statement was not contained in said statement, admitted that Wright's written statement of what he (defendant) said on the occasion referred to was correct so far as it went. He admitted that Wright, after copying in typewriting his written memoranda of what he (defendant) then had to say about the homicide, read the statement to him and that he pronounced it correct.

The superintendent of the county hospital and some other parties connected with that institution testified that the deceased, by reason of his physical afflictions already described, was not able to travel on his feet much faster than a ''walking gait''; that there was no spring to his movement when walking, but, to the contrary, he always walked like one whose lower limbs were ''in a stiffened condition.''

The People also introduced testimony of other circumstances and also evidence of physical facts bearing upon the general situation at the scene of the shooting which tended to strengthen the hypothesis maintained by the state at the trial that the homicide was the result of a deliberate purpose in the defendant to slay Sullivan without legal necessity, cause or excuse.

The defendant testified and thus made a rather feeble attempt to present a case of self-defense. He also denied making certain inculpatory statements attributed to him by witnesses to whom or in whose presence he essayed an extrajudicial explanation of the circumstances eventuating in and immediately attending the act of killing. It was, of course, with the jury to consider and determine the probative force and the effect of his testimony upon the case

made by the People. But it is perfectly clear, from the record, that there is no substantial ground for the claim made on this appeal that the verdict does not derive sufficient support from the evidence. The point especially emphasized here is, as above explained, that the question of guilt upon the evidence rests upon such a narrow margin as to intensify the damaging or baleful effect upon the rights of the defendant at the trial of certain alleged errors occurring during the trial and which involve rulings upon the question of the legal propriety of certain evidence to the admission of which the defendant objected, the alleged misconduct of the district attorney in making statements in his argument to the jury not warranted by the evidence and the refusal by the court to instruct the jury to disregard such statements when requested to do so by counsel for the accused. As we have in effect stated, if the proofs advanced by the People in support of the claims of the indictment are to be accepted at the face value of the testimony by which such proofs were made, then, it is clear, the jury, in finding the accused guilty of manslaughter— the less grievous offense embraced within the crime charged —accorded to the defendant a degree of clemency far beyond what he was legally and justly entitled to. [2] In considering the testimony upon which a finding is predicated, a reviewing court is required to appraise its probative force according to its face value, and, if it be not inherently improbable, so must be accepted as sufficient to support the fact found. This is true because it is to be presumed on appeal that the jury, who are essentially the weighers of the evidence, accepted such testimony as revealing the truth concerning the issue to which it was and is addressed. At any rate, it is perfectly clear from the record as thus far we have considered it, that the alleged errors of law forming the bases of the assignments here are to be reviewed, not upon the hypothesis that, under the evidence, the question of the guilt of the accused is close, but in view of the impregnable proposition, presented by the record, that the verdict is strongly supported, evidentially. In that light the assignments will be considered.

The first of the assignments arises out of a futile offer by the defendant to prove that the accused was a man of quick and violent temper and of a pugnacious nature by the

introduction of testimony showing that on different occasions he had struck and violently beaten other men, it being admitted that the defendant had not witnessed the assaults and, prior to the date of the homicide, had not heard or known that they occurred. The theory upon which the proposed testimony was offered was that, particularly where no other living person but the accused was an eyewitness to the circumstances immediately leading to and characterizing the act of killing, it would tend to show and to support the defendant's claim and his testimony in support thereof that the deceased was the aggressor or the one who initiated the trouble culminating in the homicide and, consequently, tend to sustain the defendant's plea of self-defense. That such an inquiry is permissible to show that the deceased was a quarrelsome, high and quick-tempered man and violently vindictive, the defendant contends is declared by Professor Wigmore in his treatise on the Law of Evidence (vol. 1, 2d ed., sec. 63), and the following cases: *State* v. *McIver*, 125 N. C. 645 [34 S. E. 439]; *State* v. *Rutledge*, 135 Iowa, 581 [113 N. W. 461, 464]; *State* v. *Jones*, 48 Mont. 505 [139 Pac. 441, 446, 447]; *People* v. *Thomson*, 92 Cal. 506, 511 [28 Pac. 589]. **[3]** It is now a pretty generally accepted or approved rule that, in a case of homicide, where the defendant sets up the plea of self-defense, and the question as to which of the two combatants, the defendant or the deceased, was the aggressor, becomes a pertinent and an important issue in the case, it is competent for the defendant not only to show, as tending to prove that the deceased was the aggressor, that the general reputation of the deceased for the quality of peace and quiet was bad, but also that the deceased had made threats, whether communicated or not communicated to the defendant prior to the homicide, to commit physical violence upon the latter. The rule as thus stated is, in its entirety, perfectly sound, since, obviously, uncommunicated threats of the character mentioned would as effectually show the animus or hostile state of mind of the deceased toward the accused as would or could threats of which the latter had been informed prior to the fatal meeting, and testimony of such uncommunicated threats would, therefore, have as direct and forceful a bearing upon the question as to which of the two was the starter

of or aggressor in the fatal combat as would or could threats by the deceased against the defendant which had been, prior to the homicide, communicated to him. And there might be some support in logic for the admissibility of proof that the deceased, in the presence of the defendant, had assaulted other persons without provocation sufficient to justify the assault, or any other fact, with which the defendant was himself personally familiar, which would tend to show that the deceased was by nature quarrelsome and belligerent. But even testimony of such specific acts of violence would inject issues of a collateral nature into the case which, if the rule sanctioning it were to be justly applied, would have to be tried out, for it would be manifestly unfair if the People were not permitted to show or make an effort to show that the acts of violence committed by the deceased in such instances were justifiable or excusable under the law. The result of the trial of such collateral matters would obviously have a tendency to cause confusion or the loss of sight of the main issue to a dangerous degree and also to prolong the trial of the principal issue to an unreasonable length. These observations apply even with greater force to the proposition that evidence of acts of violence by the deceased not communicated to the defendant, or of which he had no knowledge prior to the date of the homicide, is permissible as in support of the claim of the accused that the deceased was the aggressor in the mortal affray. The courts of our own state have not as yet gone as far in applying the character rule in instances such as we have here as counsel for the defendant would have us go. The case of *People* v. *Thomson,* 92 Cal. 506, 511 [28 Pac. 589], is not an authority for the rule as it would be applied by the defendant here. After referring to the fact of the killing and the fact that the defendant therein set up the plea of self-defense, claiming that ''the deceased made the first attack,'' the court said:

''Under these circumstances, all the acts and conduct of the deceased, either in the nature of overt acts of hostility, or threats communicated or uncommunicated, were proper evidence to be considered by the jury as shedding light— to some extent, at least—upon the issue as to whether the deceased or the defendant was the aggressor in this fatal

affray. These principles are elementary in criminal law, and a citation of authorities not demanded; but the general principles are found discussed in *People* v. *Arnold,* 15 Cal. 479; *People* v. *Scoggins,* 37 Cal. 677; *People* v. *Travis,* 56 Cal. 252; *People* v. *Tamkin,* 62 Cal. 469.''

By the words in the above excerpt, ''overt acts of hostility,'' the court undoubtedly had in mind such ''overt acts'' committed by the deceased upon the defendant and not acts of personal violence committed by the deceased upon others and of which, prior to the homicide, the defendant had no knowledge. But the situation in the instant case does not require us to express an unqualified opinion herein as to the legal soundness or propriety of the character rule which would sanction proof in cases of this character of uncommunicated acts of personal violence inflicted by the deceased upon other parties as bearing, under a plea of self-defense, upon the question as to which of the two parties was the aggressor. It may be granted, as the defendant repeatedly charged, that the deceased was a man of bad reputation and character for peace and quiet, and was often engaged in personal encounters with others. It may be granted that the deceased, as the defendant repeatedly declared was true and offered testimony to show, long cherished a profound dislike for the accused and had frequently threatened to commit personal violence upon the latter, and that the accused, consequently, had reason to expect and did expect to be attacked by the deceased at any time. Yet, as above suggested, fully cognizant of this hostility and the threats thus manifested and made against him by the deceased, and fully familiar with the custom of the deceased to take early morning walks along the highway in front of the hospital, the defendant, first arming himself with a loaded revolver, which he admitted he had not been in the habit of carrying on his person, and, as he further admitted, having observed the deceased at an early hour of the morning of the tragedy— about the hour he usually took for his daily walks—going to the highway, also almost immediately went to the road and thereby placed himself in a position where he knew that he would in all likelihood meet the deceased, his enemy, the man who had threatened to injure or kill him. [4] Thus, in proving the bad character of the deceased for

peace and quiet and proving that the latter had often threatened to inflict injury upon him, the defendant himself disclosed knowledge of facts which, if he was not designedly looking for or seeking trouble with the deceased, should have operated as a sufficient incentive to keep him from the highway on that tragic morning. In other words, proof by the defendant that the deceased was of a quarrelsome, turbulent, and pugnacious disposition and a dangerous man for a person he hated as the defendant knew that he hated him to come in contact with and that he had often threatened to injure or kill the latter, tended, as such should have been the tendency, under the circumstances of the case, to destroy rather than to sustain his plea of self-defense. Therefore, if it was legally improper to exclude testimony of instances in which the deceased had committed acts of physical violence upon persons other than defendant and of which instances the latter had no knowledge prior to the date of the homicide, the rulings foreclosing the right in the accused to make such proof was entirely without prejudice. What we have said on the question in hand applies, of course, to all other objections to rulings disallowing testimony offered by the accused designed to show similar uncommunicated acts of violence by the deceased.

[5] The other assignments of error to which counsel have directed our attention involve alleged misconduct of the district attorney in his argument of the case to the jury on behalf of the People, and which it is here claimed seriously prejudiced the case of the accused, and the refusal of the court to instruct the jury, upon motion of counsel for the defense, to disregard the remarks of the district attorney which constitute the foundation for the misconduct charged against the officer. The following are the remarks of the prosecutor of which the defendant complains:

Mr. Brown (in argument to jury): "It is not a question of manslaughter, but it is a question of this man coolly and calculatingly going out there and making his preparations and waiting until the unarmed man stubbed along there, then shot him down like a dog, and stood over his dead body and says to the witness, 'See what I have done? There is the deadly weapon,' *and he placed it there himself,* 'and I am going to make you a witness.' *That is the testimony in this case,* and it is clear and conclusive. . . . "

In using the foregoing language the district attorney did not leave the realms of legitimate argument in this case. The language merely involved the prosecutor's interpretation of the effect of and the expression of his conclusion from certain testimony properly received into the case—an interpretation and conclusion which the jurors themselves could justly have made of and drawn from the testimony. It will be borne in mind that the witness, Roy Albertson, who was driving an automobile over the highway in the direction of the spot where the shooting took place, within a few moments thereafter, and who, when near the spot, was hailed by the accused and thereupon stopped near where the body of the deceased lay in the road, testified that the defendant immediately called his (the witness') attention to the iron bar lying near the dead body of Sullivan and, after declaring that the deceased, with the iron bar in his hands, menacingly approached and threatened to use the instrument upon him (defendant), and that he thereupon shot and killed Sullivan, in effect, asked the witness particularly to notice the bar and its position on the ground with reference to the body of the deceased, expressly adding: "I am going to get a square deal out of this," referring to the homicide. The theory of the People, in presenting the case to the jury, was that the deceased did not at any time have the iron bar in his possession, but that, having gone to the highway that morning with the intention of meeting Sullivan and assaulting and perhaps killing him, the defendant himself, after firing the fatal shot, placed the iron bar near the body of the deceased to be used by him as evidence tending to support a claim by him that, in slaying Sullivan, he acted in necessary self-defense. This theory was built up by the district attorney from the circumstances developed by the evidence which finally resulted in the homicide and of which a brief recital has hereinabove been given. Obviously, the circumstances, taken together, afford reasonable ground for the support of such a theory, and the district attorney was justified in advancing it. "The district attorney," says the court in *People* v. *Rossi*, 37 Cal. App. 778, 782 [174 Pac. 916, 918], "has the right in argument to build up a theory of his case as it is made by the evidence, and often in doing so he may give expression to thoughts which have

been drawn from the realms of his imagination. If thus he keeps within the general character of the case as it is made by the proofs, then he remains within the sphere of legitimate argument. . . . As was said in *People* v. *Glaze,* 139 Cal. 154, 160 [72 Pac. 965], in reply to an objection that the district attorney abused his rights in his argument to the jury, so it may with equal propriety be said here: 'A defendant on trial for murder is not entitled as of right to be spoken of as if he were an innocent man in an argument by the officer who is endeavoring to show his guilt.' Hence, it has been well said that, in his address to the jury, a prosecuting officer may descant upon the facts proved or admitted; arraign the conduct of the parties or the witnesses; 'impugn, excuse, fortify, or condemn motives, as far as they are developed in the evidence; assail the credibility of witnesses, when impeached by direct evidence or by the inconsistency or incoherence of their testimony, their appearance upon the stand, or by circumstances. His illustrations may be as varied as the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings to his imagination.' " (*Tucker* v. *Henniker,* 41 N. H. 323; see, also, *People* v. *Molina,* 126 Cal. 505 [59 Pac. 34]; *People* v. *McMahon,* 124 Cal. 436 [57 Pac. 224]; *People* v. *Soeder,* 150 Cal. 12 [87 Pac. 1016]; *People* v. *Weber,* 149 Cal. 325 [86 Pac. 671]; *People* v. *Wheeler,* 65 Cal. 77 [2 Pac. 892]; *People* v. *Yee Foo,* 4 Cal. App. 730, 741, 742 [89 Pac. 450].) What is here said obviously disposes of the complaint that the court erred to the prejudice of the accused in declining to instruct the jury to disregard the criticised language of the prosecutor in his address to the jury. The court below held, as we hold, that the district attorney was well within his rights in expressing to the jury his views, founded upon all the circumstances, as to how the iron bar happened to be in position, in point of proximity to the body of the deceased, in which the witness, Albertson, and other witnesses saw it shortly following the homicide.

The case was ably and carefully tried, the accused accorded a perfectly fair trial, and a reflective consideration of the evidence seems to indicate that, as before suggested,

the jury were extremely merciful to the accused in reducing his offense to that of manslaughter.

The judgment and the order appealed from are affirmed.

Finch, P. J., and Plummer, J., concurred.