[Crim. No. 1022. Third Appellate District, June 9, 1928.]

THE PEOPLE, Respondent, v. PETE PECCOLE, Appellant.

Jos. H. Huberty for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, Acting P. J.—The defendant was accused by an information filed in the superior court of Calaveras County of the crime of assault with intent to commit murder (Pen. Code, sec. 217), and was convicted of the crime of assault with a deadly weapon. (Pen. Code, sec. 245.) He brings his case to this court on an appeal from the judgment of conviction and also from an order denying a motion for a new trial made by him.

It is not claimed by the accused·that there is not disclosed by the record evidence sufficient to uphold the verdict. His contention is that the court erred to the serious prejudice of his rights by allowing and disallowing certain testimony and, further, by certain asserted misconduct of the district attorney in the presentation of the case of the People to the jury; that such errors and such misconduct were of sufficient gravity to require this court to order a

reversal, notwithstanding that the verdict stands supported by sufficient evidence.

The facts will be stated herein mainly in narrative form and, with the exception of such reference to the testimony of the defendant and a witness introduced by him as may be deemed necessary, will be taken from the testimony presented by the People to support the charge. The witnesses upon whose testimony the verdict was in the main evidently founded were R. L. Blackburn, Mrs. Edna G. Blackburn, Mrs. Dorothy Hayes, and William Azevedo, the prosecuting witness. The Blackburns mentioned were husband and wife.

The crime charged in the information was committed in the early evening of December 7, 1927, at a "road-house" or public resort situated approximately a mile from the town of Campo Seco, in Calaveras County. The party alleged to have been assaulted is one William Azevedo, who, at the time the assault was committed, was in possession of and managing said public resort, which, for brevity, will hereinafter be referred to as "the resort" or "the premises." These premises were owned by one Nick Ponzetto. It was through the defendant that Azevedo met Ponzetto and leased from the latter the premises. The house consisted of a large front room, in which customers, when desiring so to do, engaged in the pastime of dancing, and in which also "soft" drinks (and as is to be inferred "drinks" not so "soft") were dispensed, two bedrooms, a kitchen and a small dining-room. The premises were situated a short distance back from a public road and were divided from the road by a fence with a gate of sufficient width to admit of the entrance of the ordinary automobile into the premises from the road. This road extended from Campo Seco to and beyond the premises.

Near the hour of 11 o'clock P. M. of December 6, 1927— the day immediately preceding that on which the assault is alleged to have been committed—the defendant, accompanied by his wife, one Giannotti, and Nick Ponzetto, made his appearance at the resort, having gone there from Campo Seco in his (defendant's) automobile. Present at the resort at that time were the Blackburns, Mrs. Hayes, and Azevedo. There is no testimony that, up to the time that defendant and his party arrived at the resort, there were

any but the most amiable and cordial relations existing between the defendant and Azevedo, or any cause for any other character of personal relations between them. However, immediately upon the appearance at the resort of the defendant, his wife, Giannotti, and Ponzetto, all the parties began drinking, and, after a few hours thus spent, Mrs. Peccole began to show evidence of being intoxicated. The defendant, observing her condition, took hold of her and started to the point where their automobile was parked on the premises, near and inside of the fence above spoken of. It appears that the other members of the party, including Azevedo, followed the defendant and his wife, going to the spot near which the automobile stood. Mrs. Peccole got into the car and the defendant, probably enraged because of her intoxicated condition, immediately began beating her about the face and body. Azevedo thereupon rushed to the car, and, placing his hand on the shoulder of defendant, exclaimed, "For —— sake, cut that out." While Azevedo and the defendant were engaged in this altercation, Mrs. Peccole jumped from the car and started to walk "up the road," whereupon defendant started after her, and, upon overtaking her, struck her a blow which knocked her to the ground and thereafter struck her several times about her body. Azevedo, observing this, or hearing the sounds of the blows, rushed to the point on the road where the defendant and his wife then were, and, declaring that he would not "stand for any man beating a woman," took hold of defendant and a fight between them ensued. Defendant struck at Azevedo several times, and the latter dealt the former several blows with his fists, finally knocking him (defendant) to the ground. Defendant received several minor injuries about his face and head. The fighting having ceased, the defendant returned to and got into his car, and overtook his wife, who was walking on the road towards Campo Seco. She entered the car and the two then started in the direction of Campo Seco. Before getting into his car (Mrs. Hayes' testimony), the defendant declared that he intended to procure a weapon and return to the premises and "shoot and kill" Azevedo, to whom the threat was immediately communicated by Mrs. Hayes.

On the following day (the 7th of December) between the hours of 5:45 and 6:30 P. M., Mrs. Blackburn, who, with

her husband, at the times concerned herein, was residing at the resort, was in the kitchen of the house, and from there, looking through the kitchen door to the outside, she observed a party, whom at first she did not recognize. When the automobile arrived at the point near the gate to the fence, she saw the driver get out of the car, and, leaving the car, with the motor still running, start toward the house. As the party was approaching the house and on reaching a point sufficiently near thereto to enable her to recognize him as the defendant (darkness then coming on) she closed the kitchen door, and then in a tone of voice loud enough to be heard by Azevedo, warned the latter of the defendant's presence. The defendant was let into the kitchen by Mrs. Blackburn and immediately asked her, "Where is my friend?" explaining to Mrs. Blackburn, upon inquiry by her as to the party he was thus referring to, that he meant Azevedo. At that moment of time Azevedo was in the "front room," or the "dance hall" part of the building. Upon being told by Mrs. Blackburn that the defendant was at the house, Azevedo stepped from the "front room" to his bedroom and procured from under the mattress of the bed his pistol. He opened his shirt and placed and concealed the weapon in the bosom thereof and thereupon stepped from the bedroom to the door between the dining-room and the kitchen. Azevedo, proceeding in the direction of the point in the kitchen where the defendant was standing with his hands in the pockets of his trousers, addressed the latter in a friendly way, saying "Hello, Pete." Without replying to that salutation or saying a word, and immediately, the defendant drew a revolver from the right front pocket of his trousers (Mrs. Blackburn's testimony) and fired in the direction of Azevedo, who testified that in his opinion the bullet missed hitting his person by approximately an inch. Azevedo, so he testified, thereupon sprang upon the defendant and "grabbed" him by the wrist of his right hand, in which he (defendant) held his pistol. A struggle between the two men followed. Azevedo (so he testified) "grabbed one arm (of the defendant) about the wrist and the other by the shoulder and give him a twist and threw him on the floor, and I think I had my knee on his hand, the one he had the gun in; then I grabbed him by the throat and choked him and he begin to

beg for me not to choke him. . . . I let loose of his throat and he rolled over on his stomach, and he got up kind of on his hands and knees and I had one hand on his back, and I told him to give me the gun. He didn't do it, so I reached in and got my gun out and took it by the barrel and hit him on the head. I saw he didn't have the gun in his hand; and there was an icebox by the door, and I thought maybe it was under there, and I was watching. Then he reached under the stove and pulled the gun out and then I hit him a light tap on the head and reached down and took the gun away from him. He got up and then wanted to shake hands. I did. I told him if he behaved himself that I wouldn't say a word to nobody about it. He agreed to the fact. When he was going out the door he said 'I am going to get another gun and come back.' . . . I unbuttoned my shirt and stuck the gun down in here (indicating his bosom). They said he was going to kill me. I didn't think he would shoot. I didn't want him to know I had the gun if he did not want trouble. . . . I had no coat or vest on that night.'' Azevedo further testified that he at no time, on the evening of the 7th of December, struck or assaulted the defendant until after the latter fired his pistol, as related.

The Blackburns saw the defendant fire his pistol, and Mrs. Blackburn said she saw the flash reflect upon the body of Azevedo. Mr. Blackburn was at the time putting wood in the stove in the kitchen, but he saw defendant shoot at Azevedo. Both witnesses testified that, instantly upon the shot being fired, Mr. Blackburn grabbed his wife and ''hustled'' her out of the house, both going together. Neither saw the struggle between Azevedo and the defendant after the shot was fired, but both heard the noise produced by the struggle.

The defendant's testimony of the occurrences in the house was very much different from the story thereof as told by Azevedo and his witnesses. As to the difficulty between Azevedo and the defendant near the gate on the night of the sixth day of December, the witness Giannotti testified that he saw Azevedo follow the defendant to the gate as the latter was taking his wife to his automobile, and heard Azevedo, when the three were near the gate, call defendant a ''dago s—n of a b——ch.'' The witness at the time was

between twenty-five and thirty feet from the gate. It was dark, Giannotti said, and he, therefore, could not see what was going on between the parties, but that he "heard" Azevedo strike the defendant several blows and saw the latter fall to the ground and Azevedo thereupon return to the house.

The defendant's testimony was to the effect that Azevedo started the trouble on the 7th of December by assaulting him (the defendant) without cause. He said that he went to the resort on the 7th of December merely to learn how the trouble of the night before had occurred and "what it was all about." He admitted, though, that he went there with a loaded pistol on his person and had it in his hand in the house, having drawn it after being struck by Azevedo; but, he continued, while the two were engaged in a struggle after he was knocked to the floor by Azevedo, his weapon was accidentally discharged. In a conversation with an officer of San Joaquin County, the defendant having gone to Stockton on the night of the 7th after the alleged assault was committed, and in a conversation subsequently with the sheriff of Calaveras County, to whose custody he was delivered by the Stockton officer, he made inconsistent statements regarding the manner in which he received his injuries, both of which were confessedly untrue. To the Stockton officer he stated that while traveling "down" a certain road about a mile from Campo Seco, he was intercepted by two men, who "pulled him out of the machine and hit him over the head with a revolver." When asked by said officer if he knew who the parties thus assaulting him were, he replied in the negative. That officer in the same conversation then said: "I will go and call up Sheriff Zwinge (sheriff of Calaveras county); this is a case for Calaveras county," whereupon the defendant said: "Don't call the sheriff." To Sheriff Zwinge, the defendant, in reply to categorically propounded questions by that officer, stated that he received his injuries by being hit "over the head by a fellow"; that he did not know who the party was that hit him, nor why he (such party) hit him; that he was hit by the party on Main Street of Campo Seco, near "two vacant lots by the old butcher shop"; that his assailant said nothing to him, but stepped up to him, struck and then choked him; that the party took no money from him;

that he had on his person the sum of $1.50 only; that he could not give a description of his assailant.

The officers, upon investigation of the premises and particularly the room in which the shooting occurred, discovered two holes, apparently made by a bullet, in the floor near the spot where Azevedo stood when, as he and the Blackburns stated, the defendant fired the shot. It was also likewise discovered that a bullet had entered and passed through the bottom of the radio stand which stood in the dining-room near the door leading therefrom into the kitchen and at which Azevedo appeared upon hearing the defendant ask Mrs. Blackburn where he (Azevedo) was. The table on which the radio stood was 17½ inches in height from the floor. In view of the reduced verdict, it is not important, and, therefore not necessary, to attempt to indicate herein, from the sheriff's description of the situation in the room as it appeared after the shooting, the probable course of the bullet after it left the pistol, since it is true that there is ample evidence which shows that the accused fired at the body of Azevedo the instant the latter appeared at the door between the dining-room and the kitchen. It may be suggested that it is apparently true from the testimony that, if he took any aim at all, the defendant directed the shot towards the lower part of Azevedo's body— perhaps below the waist; but, as above intimated, conceding that to be the fact, the evidence clearly and abundantly supports the conclusion of the jury, as indicated by their verdict, that the accused was guilty at least of assault with a deadly weapon.

The first assignment of error occurring during the course of the trial is as to the conduct of the People's witness, Mrs. Blackburn, when testifying. In the brief of defendant it is stated that that witness, when shown by the district attorney, for the purpose of identifying it, the weapon with which the defendant assaulted Azevedo, became hysterical, and stated, in response to a question by the prosecutor, that on the occasion of the assault, upon seeing defendant fire his pistol at Azevedo, she was thrown into a like nervous condition. The specific objection is that it was misconduct on the part of the district attorney to ask the witness that question. The record does not show that Mrs. Blackburn became hysterical while she was on

the witness-stand and giving her testimony, nor does it show what her particular conduct or actions were that caused the district attorney to ask her the question as to the effect upon her upon seeing the defendant draw his weapon and fire the shot on the occasion of the assault. We may judge that, when testifying, she became nervous or excited and betrayed such condition in a noticeable manner. But whatever may have been the nature of her actions on the witness-stand, whether due to hysteria or other less demonstrative acts of a super-nervous condition, the question asked her by the district attorney whether she was likewise overwrought when she witnessed the near tragedy was improper. If the question were proper under any circumstances, it involved, it seems from defendant's brief, an inquiry more appropriate for the defendant's counsel to have pursued with the view of showing, if thus he could, that the witness' mind, by reason of the nervous state into which she had been thrown by witnessing a near tragedy, was so upset or shifted from its normal poise as to render her testimony of what she claimed to have seen of the trouble not altogether dependable. Brought into the record and before the jury as it was, and assuming that the witness became hysterical upon the witness-stand while testifying, and that she was, as she said, in reply to the district attorney's question, thrown into a like condition at the time of the trouble, on seeing defendant with a weapon and shoot at Azevedo, defendant's counsel, if he did not do so in his argument to the jury, thus had opened up to him by the prosecutor an opportunity to treat the incident, if not successfully, so far as the ultimate result was concerned, in a manner favorably to his client's defense. This proposition is so obvious that it would seem that a jury composed of persons of average intelligence would thus view the matter; and for this very reason, if for no other, the error in permitting the district attorney's question to be asked and answered cannot be held, as a matter of law, or at all, to have resulted in prejudicing or militating against any substantial right of the accused in the trial of the case.

The objection that the court erred in allowing, over defendant's objections, the district attorney to show the circumstances of the difficulty between the two men on the 6th of December is untenable. The contention is that

the effect of allowing that testimony was to put before the jury "a collateral issue in the case." The rule as to the examination and cross-examination of a witness upon matters collateral to the issue made by the pleadings is that where such collateral matters are relevant to the issue being tried it is proper to inquire into them. Of course, if the collateral matters have no relevancy to the issue on trial they cannot be gone into or inquired about. In the present case, the trouble occurring between the two men on the 6th of December, as the evidence unquestionably shows, was the origin or direct cause of the assault upon Azevedo by the defendant on the seventh day of December, and, therefore, testimony showing the circumstances and the nature of the difficulty between the two men on the 6th would obviously involve matters relevant to the issue under trial. Indeed, that testimony had a direct bearing upon the issue before the jury, since thus it was revealed that the defendant had threatened that he would return to the resort and kill Azevedo for the beating the latter had administered to him (defendant). It tended to show that there was occasion for such a threat being made, and further to show that the motive or purpose of defendant's return to the resort on the 7th, armed with a loaded revolver, was to carry out the threat so made. We have yet to learn that, an assault or a homicide having been committed by a party, it is improper to prove that such party at some time previous to the commission of such crime, had threatened to commit it. Such testimony bears directly upon the question of the intent with which the act was done.

The testimony of the officers, above mentioned, of the representations to them by the accused as to the circumstances under which he received his injuries was properly allowed. The testimony was brought out in rebuttal and as in impeachment of the denial by the accused that he had had any such conversations with the officers. The testimony would have been proper as in proof of an independent fact relevant to the case. As above stated, the defendant told a different story to each officer as to how he was injured, in neither of which did he say that his injuries were the result of a physical combat between him and Azevedo; or that he had had any difficulty with the latter. He certainly had some motive for giving the officers a fabricated account

of how he had been injured, and we think the falsity of his stories as so given affords the inference that, being conscious of having committed an unjustifiable attack upon Azevedo, he purposely withheld from the officers knowledge of his visit, with a loaded revolver, to the resort on the evening of the 7th, under the fear that a disclosure of those facts to the officers would be followed by an investigation which probably would result in his arrest and prosecution for the assault. Undoubtedly, had he honestly believed, as he undertook to show at the trial of his case, that he was not in the wrong in the trouble between him and Azevedo on the evening of the 7th of December, he would have unhesitatingly told the officers the truth of how he was beaten and bruised about the head and face. This view of the defendant's false representations of the circumstances under which he received his injuries is, in no slight degree, reinforced by the fact that, when the Stockton officer, on hearing the story of the accused, stated, in the presence of the latter, that the case was one for the Calaveras County authorities and that he (the officer) would call Sheriff Zwinge of that county on the phone and give him information regarding the assault, he (defendant) protested against calling Zwinge or giving him any information about the matter. The foregoing, we think it clear from a consideration of the entire affair as the record here reveals it, is a fair and reasonable and, indeed, the only rational interpretation of the motive of the accused in giving to the officers false accounts of how he was injured, and, we may, therefore, well assume that such was the view the jury took of the untruthful representations of the circumstances under which he received his injuries. Being rationally subject to such interpretation, the testimony of the officers that the accused had given to them untruthful accounts of how he was injured was properly allowed.

On cross-examination of the People's witness, Mrs. Hayes, counsel for the defendant asked her whether she and Azevedo were, and for some time prior to the commission of the assault charged in the information, had been, living together as husband and wife, notwithstanding that they were not and never had been husband and wife. The court sustained the district attorney's objection to the question, and erred in so doing. The inquiry was proper as

tending to show that the witness cherished a friendly interest in Azevedo which would bear upon the question of the credibility of her testimony. (*People* v. *Souleotes*, 27 Cal. App. 288, 289 [149 Pac. 802], *People* v. *Crandall*, 125 Cal. 129, 136 et seq. [57 Pac. 785], concurring opinion of Justice Temple, in which Justice Henshaw and Chief Justice Beatty joined.) But it is not made to appear that from that ruling the defendant suffered prejudice to any of his substantial rights at the trial. In fact, it is quite clear from the general situation of affairs as to these parties, as the record shows it, that the jury could readily acquire the impression—a strong impression—that Azevedo and Mrs. Hayes maintained intimate personal relations with each other while they resided at the resort and even prior to the time at which Azevedo leased the premises from Ponzetto. They went to Campo Seco together in an automobile and were together when Azevedo first told the defendant that he was desirous of renting the resort. They were together when the contract of lease was executed and Azevedo thereupon put in possession of the premises. From the time such possession was taken by Azevedo until the evening of the assault both resided at the premises and occupied rooms in the house. From all these circumstances, the jury could make no mistake in concluding that the two were practically maintaining between themselves the relation of husband and wife. At any rate, it could not have been a matter of serious difficulty for the jury to discern, upon all the circumstances mentioned, that there existed between the two an uncommonly strong tie of personal friendship, naturally sufficient, if so she was disposed, to lead her so to magnify the conduct of the defendant on the occasion of the shooting as to make it appear to the jury that he was not only the aggressor in the combat, but that whatever part Azevedo took in the affray was required of him for his own protection against injury or death at the hands of the former. Thus the defendant lost no benefit or advantage of which otherwise he would have been deprived by the erroneous ruling foreclosing his right to inquire of Mrs. Hayes whether she and Azevedo were maintaining and for some time prior to the date of the assault had maintained, practically, the relation of husband and wife. But further may it be stated that if the cross-ex-

amination interdicted by the ruling now under consideration had been permitted and the fact thus sought to be elicited had been disclosed, either through the cross-examination or later by impeaching testimony, and the witness' testimony thereby wholly discredited, the jury, believing the other testimony, as it is to be presumed that they did, could not reasonably have reached any other conclusion than that evidenced by their verdict. Certainly, in view of the testimony referred to, and which has been hereinabove reviewed, it cannot properly be held that the ruling now under consideration resulted in a miscarriage of justice. (Const., art. VI, sec. 4½.)

There are several other assignments involving attacks upon the rulings of the court relative to the evidence. These we will not take the time specifically to consider herein. We have carefully examined the assignments. Some of them are without a foundation, legally, to support them. Others, even if exposing errors, are not of sufficient gravity to call for a reversal. There can hardly be any doubt from the evidence that the defendant went to the resort on the evening of the seventh day of December with the deliberate purpose of assaulting or killing Azevedo. He admitted that on the 6th of December Azevedo struck and beat him, and claimed that the act of Azevedo in thus attacking him was wholly without cause or justification. That for the punishment inflicted upon him by Azevedo he conceived and nourished a bitter grievance against Azevedo, was quite natural, and, indeed, cannot well be questioned upon a consideration of the view which he (defendant) thought he was justified in taking of the circumstances under which the punishment was administered. He threatened to procure a weapon, return to the resort and avenge the wrong to which he firmly believed Azevedo had without just cause subjected him, and he did return, with a loaded revolver on his person, to the resort. This fact itself, it may be suggested, corroborates the testimony of Mrs. Hayes that, on the night of the 6th, he made the threat that he would procure a weapon and return to the resort for the purpose of killing Azevedo. Errors in and of themselves or upon their face prejudicial to the rights of the accused would have to be found in this record to compel the conclusion that, in the face of the singularly convincing evi-

dence of the guilt of the defendant as disclosed by the record, and as pointed out herein, a miscarriage of justice had been thereby produced; and we have found here no such errors.

■ There are several assignments of misconduct on the part of the district attorney in the trial of the case which it is claimed worked prejudice to the rights of the accused. Two of these assignments only we deem worthy of special notice herein. The first which may be considered arises from the act of the prosecuting officer in recalling in rebuttal the principal witnesses for the People and, against the objection of defendant, causing them to repeat in part the testimony they had given in the People's original case. The defendant, testifying in his own behalf, stated that Azevedo started the fight on December 7th by striking him (defendant) on the head with a revolver; that up to that time he had made no threat of bodily injury upon the person of or hostile demonstration towards Azevedo. As in rebuttal, the district attorney recalled Mr. and Mrs. Blackburn and Azevedo to the witness-stand and asked them if the last named, before the defendant fired at him or displayed any purpose to assault him, struck the accused about his head or body with a revolver. The same question was asked the same witnesses in the People's original case, and the answer of each was, as was the answer of each to the same question when called in the purported rebuttal, that Azevedo made no such assault or any assault on the defendant until the latter fired the shot. It is improper to allow witnesses to reiterate the testimony previously given by them in the original case of the People "under the guise of rebuttal." (*People* v. *Van Ewan*, 111 Cal. 144, 149 [43 Pac. 520].) The reason for the rule is obviously that testimony tending to show the guilt of the accused, having been properly and necessarily received in the presentation of the People's original case, should not, in fairness to the defendant, be emphasized before the jury by a reiteration thereof by such witnesses after the defendant in his defense has presented proof tending to a contrary effect. But the error in permitting that course to be adopted by the district attorney in this case is not of such seriousness as to require a reversal. The evidence of guilt, as stated and shown hereinabove, is too apparent to justify the conclusion that

a conviction would not have been obtained but for that error. The case of *People* v. *Van Ewan, supra,* cited by the defendant, was reversed, but not because of the like error committed therein.

█ The other assignment of misconduct on the part of the prosecuting officer to be considered occurred in the course of his argument to the jury and the particular language of that officer which defendant condemns as misconduct is the following:

"Mr. Peccole was able after the shooting that night and after this choking and after these beatings over the head to get up and go out and get into his automobile, start his car and leave. Mr. Blackburn tells us that Peccole's car passed him with Peccole in it as he was going to town for help upon the hill by the cemetery. Mr. Peccole says he didn't go into Campo Seco. Very well—not a great deal of importance, but if Mr. Blackburn is telling us the truth Mr. Peccole went into town; his gun had been taken away from him by Azevedo. If he (referring to defendant) had come there that night to get Azevedo with a gun and he was still able to go about and use his strength and drive his car, as he tells us, would not the first thing that he would want to do, was to do as Mrs. Blackburn said he stated he would do—go and get another gun and come back. I say to you that Mr. Blackburn, I think, was telling us the truth and Mr. Peccole's car went on into town and he was on his way perhaps for another gun; that then it was that he came back; perhaps he went back there that night. We don't know. The other witnesses left; they came to Valley Springs and swore out a complaint."

The criticism of the foregoing language specially stressed by counsel for the defendant is that there is no evidence to be found in the record which warranted it. Mrs. Blackburn, in narrating such of the circumstances of the fight between the two men on the 7th as she witnessed, did state that she heard the defendant, as he was leaving the house after the trouble had ceased on that occasion, "make the remark that he was going to get another gun and come back and get him," referring to Azevedo; but that portion of her testimony was stricken from the record on the motion of defendant's counsel. But Azevedo testified that he heard defendant make such a threat as he was departing from

the house, and that testimony remained in the record. Of course, so long as the testimony was before the jury it could make no difference as to the person giving it, in so far as may be concerned the arguments of counsel for the parties before the jury. The theorizing by the district attorney as to what the defendant might have done after he left the premises on the 7th, thus suggesting that the accused might have procured a weapon and later on that night returned to the resort involved merely one of those speculative suggestions which are often justified, as is true here, by the general facts and circumstances of the case as they are shown by the evidence. In this instance, the district attorney, in advancing the suggestion referred to, was evidently endeavoring to impress upon the jury the proposition that, from the time he was beaten and bruised by Azevedo on the 6th up to the night of the shooting, the accused carried in his heart and mind for and towards the latter a feeling of malice and a determined purpose to gratify such feeling. There is evidence in the case which clearly authorizes that theory and the testimony of Azevedo that defendant did make the threat referred to constituted a sufficient predicate for the theory advanced by the prosecutor as indicated in his remarks before the jury objected to here. It will be borne in mind that Azevedo testified that he, Mrs. Hayes and the Blackburns left the premises immediately after the shooting and did not return thereto that night, the implication from that testimony being that those parties feared further trouble from the accused. But be that as it may, it is clear that the remarks of the prosecutor complained of here were well within the general theory of the case as it was established by the evidence. ■ A prosecuting officer, in arguing a case for the People to the jury, is entitled to advance any theory of the case which may reasonably and fairly come within the evidence received into the record. Upon this proposition, see the following cases: *People* v. *Glaze,* 139 Cal. 154 [72 Pac. 965]; *People* v. *Rossi,* 37 Cal. App. 778, 782 [174 Pac. 916, 918]; *People* v. *Swigart,* 80 Cal. App. 31, 47, 48 [251 Pac. 343]; *People* v. *Piazza,* 84 Cal. App. 58 [257 Pac. 592].

The judgment and the order are affirmed.

Jamison, J., *pro tem.,* and Plummer, J., concurred.