[Crim. No. 966. Third Appellate District.—June 18, 1927.]

THE PEOPLE, Respondent, v. PETE PIAZZA, Appellant.

[Page content redacted]

R. M. Rankin and Ezra Cox for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was charged by indictment found and returned by the grand jury of Glenn County with the crime of murder and upon a trial before a petit jury in the superior court of said county was found guilty of the crime of manslaughter. He appeals from the judgment of conviction and the order denying his motion for a new trial, and in support thereof urges the validity of the following assignments: 1. That the verdict is not supported by the evidence; 2. That the court erred in certain of its rulings relative to the evidence; 3. That a certain instruction, proposed by the defendant, as given, was so modified as to render it an incomplete statement of the rule sought to be declared therein; 4. That the district attorney, in his argument to the jury, was guilty of misconduct, the necessary effect of which was to prejudice seriously the accused in the minds of the jury; 5. That the foreman of the jury that tried defendant was guilty of prejudicial misconduct.

Preliminarily, and as conducive to an orderly presentation and understanding of the immediate circumstances attending the act of killing, it is proper to explain certain transactions of a business nature affecting the deceased

and the defendant and particularly their father and mother, the facts in relation to which were developed and shown at the trial. Ignazio Piazza, the deceased, the defendant, and one Tony Piazza, a witness in the case, were brothers. The deceased, by the parents of the brothers and also acquaintances, was known and commonly addressed and referred to as "Charley"; the defendant was likewise known as "Pete." By these names they will at times be referred to herein. The brothers were farmers and grape-growers on small farms situated in near proximity to the town of Orland, Glenn County, and had been for some six or seven years up to the time that the homicide occurred. Charley lived on his own farm with his family and Pete and Tony and their respective families lived together and in the same house on a farm not far distant from that of the deceased. Whether the latter farm was owned severally by defendant or jointly by him and Tony the record does not disclose. It was, however, owned by one or the other or both. About six years prior to the date of the homicide, Pete (so he claimed) caused to be shipped from the city of San Francisco three wine or grape-juice tanks (as they are referred to by the witnesses) to the premises of the deceased. These tanks were placed in the deceased's barn and remained there until the date of the killing. The three brothers owned jointly a grape-crusher, the brothers rotating in the use thereof in such a way as to cause no inconvenience to any of the three. The father of the three brothers, Guiseppe Piazza, and their mother, Mrs. Marian Piazza, resided in the city of San Francisco. It appears that in the month of April, 1926, the deceased was in San Francisco visiting with his parents and that at that time a cousin of his, also named Tony Piazza, applied to the father for a loan of one thousand dollars, saying that he needed the money in order to carry on his "grape business." Deceased entered into conversation with his father about his affairs and in the course thereof the old gentleman stated that he proposed to give his house and lot in San Francisco to his sons Pete and Tony. Charley then asked him how he was going to provide for him. The father stated he would let the cousin (Tony Piazza) have the one thousand dollars and that he could make out the note in the name of deceased. This was agreed to and all three

went to the bank, and the old gentleman drew one thousand. dollars therefrom and delivered it to said Tony. The latter signed a note for the amount, it having been prepared by one of the officers of the bank by direction of the father, and the deceased was made the payee thereof. Deceased got possession of the note and gave it to his wife to preserve and she held it until the time of the homicide.

1. The homicide occurred on the second day of October, 1926, between 2 and 3 o'clock P. M., in the barn of the deceased. Other than the defendant, S. D. Koons was the only witness to the homicide. Koons was a farmer living near Orland and not far distant from the ranch of the deceased. He testified that on the day of the homicide he went to the premises of the deceased for the purpose of having some grapes crushed. The crusher, it seems, had two or three days previously been taken away from the premises of the deceased to the farm of the defendant. The deceased, however, having use for a crusher on the day named, leased one from a neighbor and this was used for the crushing of the grapes of Koons. While the deceased and Koons were engaged in doing the crushing the defendant made his appearance in the barn, having gone to the deceased's farm in a Ford autotruck. On entering the barn he stepped up to his brother and a brief conversation was held between them. The deceased asked the defendant why he did not return the crusher, and the latter replied that he had been pitching hay in the daytime and irrigating at night, that he was tired and his brother (Tony) was sick and he could not help load it, and defendant further said: "I expected you to come and help me load it." The defendant then went to the crusher and engaged in conversation with Koons about the crushing of the grapes. He took hold of the handle of the machine and proceeded to operate it and thus continued to crush the grapes for a few minutes. He thereupon left the barn, but within a short space of time returned and walked over to the pile of staves which he claimed to have left there six years prior thereto and picked up one. The deceased, observing this act of the defendant, addressed the latter, saying, "You must not take those staves." The defendant thereupon threw with much force the stave at the deceased, who dodged it, and escaped being struck. The deceased

then was standing near a table between eight and ten feet from where the pile of staves lay and the defendant stood and hurled the stave at deceased. The deceased started in the direction of where the defendant was and they immediately engaged in a personal encounter. Koons watched them for some time while they were fighting and until they fell to the ground. He testified that they fought and rolled one another over for some time and then he turned and started toward the crusher with his back to them. Almost instantly, upon this movement by Koons, a pistol shot rang out and he hurriedly went to where the brothers were fighting. The defendant was on top of the deceased, holding a smoking revolver in his hand and pointing it toward the body of the deceased. Koons grabbed him by the wrist and said, "Give me that gun," and he refused, saying, "No, I won't give you my gun." Koons said, "Well, put it in your pocket," and thereupon he put it in his pocket. Koons then ordered him to get off of the deceased and he did so, but stood and held his left foot over deceased. Koons, noticing blood flowing from the face of the deceased, lifted his head and asked him if he had been shot in the head. The deceased replied, placing his hand on his left breast: "No, no, he shot me here, he shot me here." Within a brief period the wife of the deceased, Josephine Piazza, having heard the noise of the shot from her house, which was situated near the barn, rushed to the barn, and, seeing her husband lying upon the ground and bleeding, addressed the defendant, saying, "You shot my husband, your brother." The defendant answered, "Yes, I will shoot you, too," and he thereupon drew his pistol from his pocket and she turned and ran around a milk-house and back of and into the chicken-house. He then left the barn with the pistol still in his hand and went to where his automobile was parked. Koons followed him and "told him to get into the machine and get away; there had been trouble enough. He put the gun in his pocket," continued Koons, "and climbed into the machine and then after he got in his machine he took it (the pistol) out of his pocket and stuck it down behind the cushion." Koons further testified that the defendant, after passing through the gate leading into the premises of the deceased, turned his machine so that it faced the gate and there parked it.

Josephine Piazza, wife of the deceased, testified that she saw from her house the defendant enter the gate surrounding the premises and go into the barn; that a short time thereafter she heard a pistol shot, the noise of which seemed to come from the direction of the barn; that she asked her mother (who was living with her) if she had heard the shot, to which the mother replied: "Yes it sounded in the barn." She then asked her daughter, Marian, if she heard the shot and she replied in the negative. She testified that Marian, her daughter, immediately ran toward the barn and she (the witness) followed her and when they got to a gate near the big barn door facing their house, and, as the witness was in the act of going into the barn, she saw the defendant and said to him, "Did you shoot Charley?" He said, "Yes, you son-of-a-b——, I will shoot you, too"; that she thereupon ran back of her house and then toward the chicken-house; that after she got into the chicken-house she looked through a "little window" and saw the defendant running toward the residence. She further testified that after the shot was fired and as she was approaching the barn she heard her husband moaning and exclaiming, "Josie, help," evidently referring to the witness, the deceased being in the habit of addressing her as Josie. She said that as she saw the defendant leaving the premises in his machine she went into the barn and found her husband on his hands and knees with his head hanging downward; and that she went on her knees and put his head on one of them. She stated that her husband had a black and blue mark on his forehead, a bite on his left cheek, a bite on the right breast and a "big hole shot in his left breast and bleeding." She testified that three or four days before the day of the killing the defendant and his brother Tony visited the premises of the deceased and stopped at the barn, where they entered into a conversation with the deceased; that she was then in the house, but that she heard loud talking between the men and also noises which sounded like they might be fighting; that she took her baby in her arms and went out into the yard as far as the truck owned by defendant; that she heard the defendant say to the deceased that if he did not take that note to his mother he (deceased) was going to pay for it and then they drove away. Parenthetically, it may at this juncture be explained that the note referred to

was the one given by their cousin Tony Piazza to the deceased in San Francisco in April, 1926, for one thousand dollars, which was delivered to said Tony by the father of the three brothers.

Marian Piazza, the daughter of the deceased and Josephine Piazza, testified that she saw the defendant when he reached the farm of her father and saw him enter the barn; that she herself later entered the barn for the purpose of hunting for eggs; that while she was in there engaged in that employment she heard the defendant and her father and Mr. Koons talking with each other; that she left the barn and went to the house and into the kitchen and shortly thereafter, having heard her mother ask her grandmother a question relative to what was going on in the barn, she immediately started toward the barn and entered it. Before getting inside she heard her father moaning and "calling, 'Josie, help.'" When she entered the barn she found her father on his knees, with one hand on his head which was hanging down and "I found Uncle Pete still with the gun pointing at him like that" (indicating), that is, he was standing over the deceased and pointing the revolver downward toward the body of the latter; that she thereupon started toward the gate to go into the road and give the alarm to their neighbors; that about the time the defendant started to leave the premises, but before doing so, she heard him say to someone—she did not know who—"You son-of-a-b——, I will shoot you, too"; that she thereafter got out into the road, ran a considerable distance toward the houses of several different neighbors and shouted with such vigor as to attract the attention of some of them and they left their homes and immediately went over to the barn, having been told by the witness that her father had been shot. She testified, as did her mother and the witness Koons, that the weapon that she saw in the hands of the defendant at the time was a nickel-plated revolver. She also testified that three or four days before the time at which the homicide occurred, she saw the defendant and his brother Tony at the barn on their farm; that they came in an autotruck on which they loaded the grape-crusher which, as before stated, was jointly owned by the three brothers; that she heard from the porch of the house a conversation carried on between the three and that the manner

in which they were talking seemed to indicate that they were going to fight; that they were "talking about that note"; that she heard the conversation between Tony and her father as follows: Defendant: "You take that note to your mother." Father: "Come into the house and you can read it." Defendant: "No, you take it to your mother." And just before Tony and Pete left and as they were getting into the car defendant said, addressing the deceased, "Don't forget, you take that note to your mother or you will pay for it."

R. J. Yates, a farmer living about two hundred yards from the home of the deceased, his farm bordering on a road running east and west, testified that he left his house about 2:35 P. M. to go to his letter-box; that when he reached the northeast corner of his house he heard a "muffled shot," the sound coming from the direction of the barn of the deceased; that he thereupon cut across the corner of his place, thus saving fifty feet distance between his farm and the barn of the deceased, and ran to said barn. "I heard quite a lot of 'hollering,' " he said, and as he reached the barn he saw a number of other neighbors going toward the barn. He said that he saw Marian, the daughter of the deceased, going through the gate into her father's premises after the defendant had left. On going into the barn he saw Mr. Koons and also the deceased on his knees and holding his hand over his side; that "there was blood all over his face and running down his head on the side of his face."

Dr. J. D. Edmundson, a physician and surgeon, practicing his profession at Orland, was immediately summoned after the shooting and in response immediately went to the home of the deceased. When he arrived there he found that the deceased had passed away. He at that time made a cursory examination of the body of deceased and found a gunshot wound which apparently had entered between the third and fourth ribs a little above the heart. He also noticed bruises on the face and observed that the "left part of his nose was near cut off and split on one side." Later Dr. Edmundson assisted Dr. F. M. Lawson of Willows, county physician of Glenn County, in conducting the autoptical examination of the body of the deceased. The results of this examination were substantially in accord with

those of the superficial examination previously made by Dr. Edmundson. The physicians, however, probed the gunshot wound and found it to have entered the body two inches above the left nipple and passed entirely through the body, coming out just to the left of the spinal column and about five inches higher up than at the point of entrance. The other wounds—those in the face and breast—were described by Dr. Lawson, who stated that they appeared to have been caused by biting.

Deputy Sheriff Carl Heard of Glenn County, immediately upon learning of the shooting, hastened to the scene of the homicide and proceeded to make a search for the defendant. The defendant, however, had left the deceased's premises and the deputy sheriff then went to the residence of the former and there searched for him. The officer testified that he kept up the search throughout the entire night, having during the night gone to the home of the defendant several times and renewed his searches there without avail.

Sheriff Roy Heard testified that he also immediately repaired to the premises of the deceased upon learning of the homicide; that he arrived there some time after 4 o'clock, found the deceased wounded as already described, and that he was the party who sent for Dr. Edmundson. He said that he made a search of the premises of the deceased for the purpose of apprehending the defendant if he were there, but that he was unsuccessful, the defendant having left before he arrived at said premises. He also testified that the first time he saw the defendant after the homicide was committed was at the county jail about 5 o'clock the day succeeding that of the shooting, the accused having been brought to the jail by a traffic officer at Corning, Tehama County, by the name of Hobson.

The story of the defendant relative to the homicide and the circumstances leading thereto was briefly as follows: That he went to the home of the deceased on the day of the homicide in his Ford truck, his purpose being to take to his home the wine tanks or the staves of which they are made; that he spoke to Mr. Koons and discussed with him the matter of crushing grapes and himself took hold of the handle of the crusher and crushed a few; that thereafter he stepped over to the pile of staves and picked up one; that his brother thereupon said to him that he could not

take those staves, as they belonged to him (deceased); that at about the same time the deceased rushed toward him and got him by the body and feet and tripped him and they fell to the floor, where they rolled over and then the deceased began biting him; that he in turn inserted his teeth in the flesh of the deceased in several different places and finally, while he was on top of the deceased, observed that the latter had a pistol in his left hand; that he immediately grabbed the pistol and each attempted to use it on the other, or that he attempted to prevent the deceased from shooting him; that within a few seconds the pistol was discharged, with the result as above stated. He denied having thrown a stave at his brother, denied that he threatened his sister-in-law, the wife of the deceased, and denied that he flourished a pistol and threatened to shoot her. He said that he did not take a pistol with him to the premises of the deceased and that the pistol with which the shooting was done was owned by the last named. After the trouble had ended, he said, he got in his truck, and, without stopping at his home, proceeded in the direction of Hamilton City, which is situated about eight miles east of the town of Orland. He testified that he was anxious to get to the Sacramento River, which was a few miles beyond Hamilton City, as he was very thirsty and also desired to bathe his face. He finally reached the river, drank some water and bathed his wounds and then got into his car and started in the direction of the town of Corning, Tehama County; that he had gone but a short distance when he became drowsy and everything appeared to him to be dark, and he then concluded to stop the car and take a sleep. This he did and remained in the car until late in the night, when he awoke and then started on his journey, going to a farm situated near Corning, where at one time he was employed. When morning came, he proceeded, he went to the home of a cousin of his not far from the town of Corning. He told his cousin about the difficulty between him and his brother and the shooting and requested his cousin to get an officer so he could surrender himself. The cousin went out and found the traffic officer above named and the defendant was taken by him to the county jail of Glenn County, arriving there about the hour of 5 o'clock on Sunday, the third day of October.

The defendant admitted that he had on several occasions discussed the matter of the note above spoken of with the deceased. He said that he had been appointed, by request of his mother, administrator of the estate of his deceased father and that (as is clearly to be implied from his testimony) he considered it his duty to look after and secure the possession of all the assets of the estate, of which he regarded said note as a part. He stated, however, that his discussions with the deceased regarding this note were inspired by his mother who needed the money (the estate being of little value), and that he did not carry any personal feeling or resentment in the discussions.

The wife of the defendant testified that he owned a pistol but that he left it at their home when he went to the deceased's home on the day of the shooting; that her husband carried no weapon with him that day. She exhibited the pistol at the house to the officers and other persons and it, according to said officers, corresponded with the description of the weapon with which the shooting was done as it was described by Koons, the widow of the deceased and their daughter. Other members of the defendant's family gave substantially the same testimony as given by the wife of the defendant.

One Sam Passafiume testified that some two or three days before the killing he was with defendant and deceased in a cornfield about three-fourths of a mile from the deceased's place (whether the defendant's cornfield or not the record does not show), and that deceased seemed to be acting in a sullen manner; that defendant, addressing the deceased, asked him what was the cause of his queer actions; that the latter replied in effect that defendant had caused a notice of some character in connection with their father's estate to be mailed to him (probably a notice of the date fixed for the hearing of the defendant's application to be appointed administrator), and that he did so to annoy him (deceased). The witness further testified that, on the same day and within a few minutes only after that conversation between the two brothers, he and deceased, out of the hearing of the defendant, held a conversation, in the course of which, and referring to the notice mentioned, the deceased, speaking of the defendant, said: "My brother give me trouble. He got the square head. It is better

to kill him." On cross-examination the witness said that he did not at any time communicate that conversation either to defendant or his brother Tony. It was also thus brought out that Passafiume, at the first trial of the case, it having been once before tried (the jury disagreeing) did not give that particular testimony.

There was considerable testimony received regarding the merits or demerits of the claim of the deceased that he was the owner of the note to which reference has been made above. This testimony, except in so far as the fact of its existence was concerned and that there was a controversy between the defendant and the deceased concerning the ownership thereof, threw no light on the issues before the jury and, indeed, was not relevant to the issues.

The above brief statement of the facts as they were related by the witnesses for the people and by the defendant and his wife embraces a synoptical recital of all the important testimony directly involving a disclosure of the circumstances leading to and attending the commission of the homicide.

From the testimony, as thus it has been presented herein, and the conclusion arrived at by the jury, as evidenced by their verdict, it may properly be assumed that the following facts were found, and on this appeal must be taken as the established facts in the case, viz.: First, that a bitter feeling had been conceived and was nourished by the defendant against the deceased because of the latter's claim that he was the real owner of the note for one thousand dollars or the money represented by said note which their father had loaned to their cousin, the deceased claiming, as has been shown, that his father, in his lifetime, had given him the money, and, to the end that he might receive the same, directed that the note be made, and accordingly it was made payable to the deceased; second, that there existed a difference between the two brothers relative to the ownership of the wine or grape-juice tanks or staves mentioned and the defendant's feeling of bitterness against the deceased was thereby intensified; third, that defendant, arming himself with a pistol, went to the farm of the deceased on Saturday, October 2, 1926, for the purpose of carrying away the staves or tanks; fourth, that when he went to the pile of staves and picked up one and the deceased protested against the taking of the staves by him,

the defendant threw the same at the deceased with great force and that the latter escaped being struck by the stave only by dodging it; fifth, that the two brothers then engaged in a personal combat, fell to the ground and in the scuffle rolled one another over, one being on top and then the other, alternately, and viciously biting each other; that at last, while the defendant was on top of the deceased he (defendant) drew his revolver and fired a shot into the body of his brother, inflicting a mortal wound; that he remained over his body with the weapon still pointed toward the body of the deceased until S. D. Koons, the witness above referred to, made him arise; that he then held his foot over the deceased until said Koons induced him to put his pistol in his pocket; sixth, that the widow of the deceased, having heard the shot from the pistol, rushed toward the barn and was there met by the defendant who, after acknowledging in response to her inquiry that he had shot her husband, drew his pistol from his pocket and, calling her an opprobrious name, said that he would kill her, too. The jury could further have concluded, from all the circumstances in the case, that the defendant, after leaving the premises of the deceased, went to his own home, left his revolver there and thereupon departed from his house with the intention of fleeing and thus escaping apprehension by the officers. It cannot for a moment be doubted that the foregoing facts were sufficient to establish a case of murder against the defendant. It is true that the testimony is in conflict upon some of the vital questions of fact in the case, but, as is well understood, it was for the jury to resolve all conflicts and upon the entire evidence determine whether the defendant was or was not guilty of murder or any other offense embraced within that crime. In this connection, it may be suggested that it is a significant fact that if, as the defendant testified, the shooting was done with the weapon of the deceased under the circumstances described by Koons, he would have taken with him to his home said weapon. It will be noted from the testimony above given by all the witnesses, other than the defendant and his witnesses, that no weapon was found near the deceased immediately after the shooting or on his premises at any time subsequent thereto, a search having been made by the officers for a weapon within a few hours after the

homicide was committed. But, be this as it may, it is perfectly clear that, as stated above, a very strong case of murder was made against the defendant and that he received at the hands of the jury a most considerate degree of mercy when they returned a verdict of guilty against him of the lowest offense comprehended within the crime charged in the indictment.

2. The rulings relative to the evidence to which the defendant objects involve the action of the trial court in striking out the testimony of certain character witnesses introduced by him. The witness F. M. Myers a resident of Orland, was asked whether, prior to the date of the homicide, he knew the general reputation of the defendant "for peace and quiet" in the community in which he resided, to which question he made an affirmative answer, and then stated, in reply to a question as to what that reputation was, that it was good. On cross-examination, the district attorney, seeking to learn the basis of his testimony that the general reputation of the defendant for the traits named in said community was good, asked Myers if he had ever heard such general reputation discussed in Orland or immediately thereabouts. The witness stated that he had not. Thereupon the district attorney moved to strike out his testimony. The motion was granted as to the answer of the witness that such reputation "was good," the court saying, however, that the statement of the witness that he had never heard the defendant's general reputation discussed constituted proper testimony for the reason, as the court further explained, that "if he (the witness) has not discussed it, it is in there, and from that the jury can infer that he (the party whose general reputation is under inquiry) has a good reputation." The theory of the court seems to have been that the true rule as to this character of testimony is that, while it is proper to permit a character witness to testify that he never heard the general reputation of a party in the community in which he resides for certain traits of character discussed, it is wholly with the jury to infer and find and not for the witness himself to state, as a conclusion from such testimony, that such reputation "is good." The theory of the judge that the jury, from testimony of the fact that a party's general reputation in the community in which he resides for

certain traits of character has never been discussed by the witness or heard discussed by him, thus become as well prepared to form the conclusion that such reputation of such party is good as is or would be the witness, is logically sound. The only question involved in the inquiry which could become serious or important would be whether the witness had told the truth when declaring that he never discussed or heard discussed the general reputation of the party whose character was under investigation. But, according to the established technical procedure or rule with respect to the admissibility of such proof, the order striking out the answer of the witness Myers that the general reputation, etc., of defendant was good, was erroneous.

The true rule as to that sort of testimony is that, if the witness declares that he has never heard discussed nor himself discussed the general reputation of a party for certain traits of personal character in the community in which both reside and have for some period of time resided, it is competent for such witness to conclude from that fact and testify that such general reputation is good. The rule is well stated by Mr. Justice Henshaw in *People* v. *Adams,* 137 Cal. 580, at 582 [70 Pac. 662], as follows:

"It is a matter of common sense, common observation, and common knowledge that a man's reputation for peace and quiet is seldom a matter of discussion until some alleged breach of the law calls up its consideration. Thus in *Regina* v. *Cory,* 10 Cox C. C. 22, Chief Justice Cockburn remarks: 'I am ready to admit that negative evidence to which I have referred, of a man's saying "I never heard anything against the character of the person of whose character I came to speak on," should not be excluded. I think the fact that it is given in the negative form is the most cogent evidence of a man's good character and reputation, because a man's character does not get talked about until there is some fault to be found with him. It is the best evidence of his character that he is not talked about at all. I think the evidence is admissible in that sense.' And so, without multiplying quotations upon the question, may be cited: *Ward* v. *State,* 28 Ala. 53; *State* v. *Nelson,* 58 Iowa, 208 [12 N. W. 253]; *State* v. *Lee,* 22 Minn. 407 [21 Am. Rep. 769]; *Davis* v. *Foster,* 68 Ind. 238; *Craig* v. *Craig,* 5 Rawle (Pa.), 91; *Johnson* v. *Brown,* 51 Tex. 65; *Davis* v.

*Franke,* 33 Gratt. (Pa.) 413; Rice's Criminal Evidence, sec. 380; Taylor's Criminal Evidence, sec. 350." (See *People* v. *Stennett,* 51 Cal. App. 370 [197 Pac. 372]; 8 Cal. Jur., p. 57.)

But with the rule before us, as it is so expressed, it cannot be said with justness in this case, in view of the remarks of the court in making the order striking out upon the theory as conceived by the judge and explained by him, as indicated above, the answer of the witness that the defendant's general reputation for peace and quiet was good, that the accused could have suffered even the slightest prejudice from said order. The court, in making that ruling, while not directly addressing the jury, nevertheless, in effect, thus told them that such statement by the witness afforded the inference, which the jury *can* draw, that he (defendant) bore such good reputation in such community. True, the district attorney objected to said remarks, but they were not withdrawn by the court and remained in the record to all intents and purposes as an instruction to the jury that they were at liberty—indeed, that it was their duty—to infer from the testimony of the witness Myers that he had never heard the defendant's general reputation for peace and quiet in the community in which he and the witness resided discussed that his (the defendant's) general reputation for the traits named was good. Of course, if it were, as a legal proposition, correct to say that from the testimony of the witness that he had never heard the general reputation of the defendant for peace and quiet discussed, it was for the jury to determine and not the witness to state that such reputation was good, it would not be true that it would be the *duty* of the jury to infer from such testimony that such reputation was good, since, as before suggested, there would still be the question for the jury's solution whether the witness had or had not heard such discussion. But it stands true that the tendency of the remarks of the court in ruling upon the question of the legal propriety of said testimony was to benefit rather than damage the defendant. It is hardly necessary to suggest that if the same ruling and in connection therewith the same remarks had been made by the court as to the testimony of a witness testifying for the people—that is, for instance, as to that of a witness testifying in behalf of the prosecution that the general reputation

of the defendant for peace and quiet was bad—the defendant would have just cause for complaint, although, even in such case, it might transpire that the record was such that the error involved in the ruling and the remarks would avail him nothing in the disposition of the case on appeal.

The next assignment under the present head—why made, though, we are unable to perceive—relates to the testimony of the defense witness, Cooper, who was asked the usual preliminary questions as to the general reputation of the defendant and then whether such general reputation was good or bad, to which he replied that it was "good." On cross-examination the prosecuting attorney asked the witness whether he had discussed such general reputation with citizens or residents of Orland and vicinity, and he replied in the negative. No motion was made by the district attorney to strike out Cooper's testimony, and it therefore remained in the record to be considered by the jury. There was nothing said by the court, in ruling on objections to Cooper's testimony, or that was said by the district attorney in arguing the objections, that tended in any measure to prejudice the rights of the accused.

A like assignment is urged against the action of the court with respect to the character testimony of the defense witness, George Wright. That witness testified that the general reputation of the defendant in the Orland community for peace and quiet was good. In his cross-examination by the district attorney he stated that he had never heard defendant's reputation for those traits of character discussed, and had himself never discussed it. On a motion by the district attorney to strike out the testimony, the following took place between court and counsel: The court: "I think it must go out. Of course the testimony that he never heard it discussed will remain." Mr. Rankin, defense counsel: "As I understand it, to be clear, his answer that he knows the reputation and that it is good is stricken out." The court: "No, that will stand, that it has never been discussed, never heard it discussed before and that he discussed it after the offense of course is not proper." Mr. Rankin: "That is the portion that goes out." The court: "Yes." Frankly speaking, it is difficult definitely to determine from the foregoing colloquy between the court and counsel what part or parts of the answer were stricken out.

Assuming, though, that the court purposed to strike out that part of the witness' testimony that the reputation of the defendant was good and to permit to stand in the record the part to the effect that the witness had never heard defendant's reputation discussed, then what is said above relative to the ruling on the testimony of the witness, Myers, is equally pertinent to the action of the court respecting its rulings as to the testimony presently being considered.

3. The instruction, the modification of which by the court is complained of by the defendant, as originally framed and proposed by the accused, reads as follows: "Proof of good character, when shown by the evidence, comes in aid of the general presumption of innocence, and is no more to be laid out of view by the jury in their deliberations than is the original presumption itself. The good character of the prisoner, when proven, is itself a fact in the case. It is a circumstance tending in a greater or less degree to establish his innocence and cannot be put aside by the jury in order to ascertain if the other facts and circumstances considered by themselves do not establish guilt beyond a reasonable doubt."

The court modified the instruction by eliminating therefrom the following language, and as so modified gave it to the jury: "And cannot be put aside by the jury in order to ascertain if the other facts and circumstances considered by themselves do not establish guilt beyond a reasonable doubt."

Only a casual reading of the instruction as modified in comparison with the instruction in the form in which it was proposed is necessary to show that as modified and given it clearly and with sufficient fullness declares the rule respecting the subject to which it relates. The part omitted from the instruction is, in effect, but a repetition of the preceding language thereof. It will be noted that, as given, the instruction states, and properly so, that evidence of good character, when received, supports the general presumption of innocence, "and is no more to be laid out of view by the jury in their deliberations than is the original presumption itself." The part eliminated states, substantially, the same proposition, although in a different form of language. But the objection particularly emphasized by

counsel against the action of the court in modifying the instruction is (so the contention goes) that it was not only inapplicable, since the court "ruled out the evidence of general reputation," but that the jury "would naturally understand (from the instruction, as given, we may assume is meant), the defendant's proof of good reputation failed, and, therefore, was *not* to be considered in the case." To that proposition and the reasoning advanced in its support and the conclusion which is to be deduced therefrom, there are several satisfactory answers, which thus may be summarized: First, that (obviously) the effect of the instruction in the form in which it was submitted to the court for approval would be the same as is claimed for it in the form in which it was modified and given, and that counsel presumably well knowing the condition of the record as to character testimony, themselves asked the court to include the instruction in its charge to the jury, and, therefore, are in no position to complain because it was given, even if it was erroneous to give it in any form; second, that the instruction was applicable upon the theory, as explained before the jury by the court, upon which the court excluded the answers to the character testimony for defendant, that his general reputation for peace and quiet was good; third, that the testimony of at least two (and, we think, three) of the character witnesses for the accused, in which their answers that defendant's general reputation for the traits stated was "good," was not disturbed but allowed to remain in the record as it was given. The foregoing involves a sufficient consideration of the present assignment.

4. The district attorney, in the course of his address to the jury, made statements which counsel claim involved gross disparagement of the Italian race, as a class (the defendant being a native of Italy), and for this, it is charged, that official was guilty of misconduct which wrongfully and, indeed, so seriously affected the rights of the defendant as to have prevented him from securing a fair and impartial trial. The language of the district attorney first adverted to by counsel for the defense, and upon which the charge of misconduct is in part predicated, is as follows:

"He (referring to Tony, brother of defendant) is the bird that goes in and gets these letters of administration. He is the gentleman who shows up here today with a deed in his pocket. He is the fine Italian hand in this situation throughout, and he has a particular prominent hand throughout. . . .

"Sam Passafiume (witness for defendant whose testimony is above considered), I think you could infer from his testimony, is no—he is a pretty smart Italian. He seeks the usual 'out' that all of those people seek in this way. If you want to try to get a nickel from him they can understand perfectly, but if you go to ask them something that they don't want to understand, no sabe, right away, no sabe right away, immediately no sabe. Now Sam is no ordinary hombre and he knows just exactly what he is doing in connection with those things, and what does Sam do. He is also in this league. He is in this league of people from the same part of Italy, from the same neighborhood. Sicilian. They want to help out their fellow townsman. . . .

"The sole question is, are you going to make these people abide by our laws. Are you going to make them do business in the American way or are you going to let them shoot you, or me, or anyone else, in that method, their method of settling quarrels, and make a Chicago out of Glenn County, a Sicily out of Glenn County, and let these men shoot you if they have a difficulty with you, and settle their troubles in that method, or shall we do it according to the law of this land, and the customs of America. That is what we are here for today and I think you gentlemen will take that most important viewpoint."

The specific objection against the foregoing remarks is that the district attorney thus attempted to prejudice the jury against the accused because of the race to which he belongs—that is, because he is an Italian—and, at least, by inneundo charged that Italians, as a race, in their native country were propensed to the taking of the law into their own hands rather than to submit to constituted authority in the settlement of differences among themselves, or if brought into a court of justice, will not scruple to fabricate and give false testimony, if the ends they seek to attain require it; that, on coming to our country and locating here, they bring

with them the same notions and practice the same methods. The recent case of *People* v. *Simon*, 80 Cal. App. 675 [252 Pac. 758], decided by this court, Judge H. L. Preston, of the superior court of Mendocino County, sitting *pro tem.* on this bench, writing the opinion, is cited by counsel as supporting their position that the district attorney's remarks were so prejudicial as to imperatively demand a reversal. In that case, it appears, the defendant was a Hebrew charged with the crime of burning insured property, with the intent to defraud the insurers, and the district attorney, in his argument to the jury, said, among other like and equally reprehensible criticisms of the accused: "There has, of course, grown up a suspicion in this country with reference to fires, whenever a Jew has anything to do with it. . . . And that is the reason they were asking you that question (presumably a *voir dire* question relative to the nativity or religion of the defendant) was because of the fact that there has been so many fires where the Jew lived in the house in order to obtain the (insurance) money."

The foregoing language constituted misconduct on the part of the district attorney of the most flagrant character and was itself sufficient to compel a reversal. There is absolutely no justification for such a general assault upon the race of people referred to by the district attorney in the Simon case; nor is there justification for any such an attack upon any civilized race of people as a class. There are the good and the bad in all classes or all races, but the latter represent the exception in all. There is, however, a distinction in the particular situation in the Simon case and that in the case at bar. The obvious purpose of the district attorney, in referring derisively to the defendant and the defense witness Passafiume as Italians and insinuating that the framing up of court cases, to which they are parties, or in which they are solicitously interested, was a common practice with and among the Italians as a race, was to degrade or depreciate the evidentiary value of their testimony. Therefore, since the deceased also was an Italian and his widow, daughter, and his cousin, Tony Piazza, were of the same race, the three last named testifying for the people to important and singularly significant facts, it is but reasonable to assume that the effect of the remarks of the prosecutor, if indeed they had any effect at all upon

the minds of the jury, was to cause no less damage to the case of the people than that of the defendant. In the Simon case, there was no witness of the Hebrew race that testified for the people. The defendant himself was the only Hebrew concerned in that case, hence the conduct of the district attorney therein in appealing to race prejudice to obtain a conviction was far more vulnerable, so far as the effect it is to be presumed to have had upon the minds of the jury in their consideration and discussion of the case is concerned, than that of the district attorney in the instant case in uttering the remarks to the jury hereinabove reproduced. From this consideration, however, it must not be assumed that we intend to hold, as a matter of law, that the remarks complained of here were not calculated to injure the defendant, merely because they probably more or less had the same effect upon the people's case. There might be in such a situation other considerations entering into the deliberations of the jury which might lead them to throw entirely against the accused the weight of any prejudice with which their minds might have been poisoned by the remarks of the district attorney in disparagement of the honesty and integrity of the Italian people as a race. But the point we make is this: That in the Simon case, because of its peculiar circumstances, the mollifying lubricant confined within and at proper times percolating through and out of section 4½ of article VI of the constitution could not penetrate the huge wall of prejudice so firmly erected by the district attorney and so smooth down or eliminate the damaging friction between the invaded rights of the accused and his constitutional guarantee of a fair and impartial trial; whereas, in the present instance, the misconduct, while justly subject to severe censure, was not so serious as to compel the conclusion that a miscarriage of justice followed therefrom, when it is considered and viewed in the light of the conclusive character of the evidence presented by the people as in proof of the guilt of the defendant and the fact that such misconduct had application alike to the people's and the defendant's important witnesses. It should be added, however, that there are parts of the remarks of the district attorney included within the above excerpts from his address to the jury that constituted legitimate subjects of discussion. He was entitled to present any

theory of the case fairly and reasonably within or deducible from the evidence. In this regard considerable latitude is to be accorded to the prosecutor in presenting his case to the jury. As to this, it is sufficient to refer to *People* v. *Glaze,* 139 Cal. 154 [72 Pac. 965], and cases therein cited; *People* v. *Swigart,* 80 Cal. App. 31 [251 Pac. 343].

Referring to the note executed by the cousin, Tony Piazza, and of which frequent mention has been made above, and to the claim by the defense that the father of deceased and defendant never intended that the money loaned to the cousin was to go to the deceased in exclusion of other members of the family, and that deceased, fraudulently or by undue influence, procured the instrument to be made in his name as the payee thereof, the district attorney in the course of his argument, said, in effect, that if such claim of the defense was well founded defendant should have subpoenaed and so have produced as a witness the officer of the bank at which the note transaction was had and who prepared the note at the request of the father and in his presence, and thus have shown, if he could, that said transaction as it was carried out was superinduced by the fraud or undue influence of the deceased; or, in other words, thus show that the transaction did not, in material respects, occur or was carried out as described in the testimony of Tony Piazza, the cousin, he having testified that the father gave the money to the deceased and directed the note to be made out in the latter's favor. The district attorney was properly permitted to prove that the genesis of the hostile feeling between the defendant and the deceased was the controversy over the note in question, and that the defendant had angrily made a statement to the deceased, which might reasonably be interpreted as a threat to commit personal violence on the latter if the condition involved in the statement were not complied with, and conceivably, as a motive for the act of killing, that unless he (deceased) delivered the note to their mother the deceased "would pay for it." This was as far as the inquiry, so far as the note was concerned, should have been permitted to be extended. In other words, proof of the fact that the note was made to evidence a loan of money owned by the father of the brothers, of the fact that the deceased was named in the note as the payee thereof, and of the fact that the de-

fendant claimed that the father did not intend to make a gift of the note or the money payable thereunder to deceased, and that the controversy between the brothers thereupon arising became very bitter, was all that it was proper or necessary to be made relative to that transaction. But counsel for the defendant, with vigorous persistency, pressed upon the court the proposition that they had the legal right to go fully into the merits of the controversy, and, although frequently asseverating that an investigation of the merits in this case could result only in introducing issues collateral and entirely foreign to any question which could legitimately be tried under the indictment, or to any evidence relating to the charge and which might be presented and properly received, the court, nevertheless, permitted, over objection by the district attorney, counsel for the accused to open up and press to the limit and inquire as to whether the note really was owned by the deceased or by the estate of the deceased father of the two brothers. That counsel, having taken the initiative in bringing the merits of the controversy into the case, discussed the merits thereof in their arguments to the jury is a clearly warranted conclusion. In fact, the parts of the argument of the district attorney complained of here plainly imply that counsel for the defense, in their discussion of the case to the jury, went into the merits of the controversy quite fully. Thus the defendant himself, through his counsel, directly invited full discussion of the merits of the controversy by the district attorney, and, while that officer's declaration or insinuation in his address to the jury that the bank officer who prepared the note according to the directions of the father of the brothers was not subpoenaed and produced as a witness by the defendant, was because said officer would not have supported defendant's claim that the transaction was fraudulent or brought about through improper influence brought to bear upon the father of the two brothers by the deceased, was improper, still it is hardly reasonable to conceive, in view of the repeated declarations of the court that the merits of the controversy were wholly foreign to the issues of the case, how it could have exerted any influence upon the minds of the jury against the accused or his constitutional right to a fair trial upon the question whether the slaying of the deceased by the defendant was or was

not justifiable or excusable under the law. This consideration, together with the fact that, as before stated, an examination of the evidence discloses a strong case of guilt—indeed, a case in which it clearly appears that a verdict of manslaughter possesses the quality of mercy in a very great degree—irresistibly conduces to the conclusion that the misconduct under review has not resulted in a miscarriage of justice.

Again, proceeding under the present head of assignments, the district attorney referred to the fact that, although the young son of the witness Passafiume, so the latter stated, was present in the cornfield in which the witness and the deceased held a conversation, in the course of which the latter, after some angry words with defendant about the note, remarked in the presence of the son that it would be better to kill "that square-head," referring to the defendant, or words to that effect, the defense failed to call the lad as a witness to corroborate that testimony of his father and intimated that such failure was due to the fact that counsel for the accused were fearful lest, on cross-examination, the boy would not corroborate his father's testimony in that particular. "What do they (counsel for the defense) know," exclaimed the prosecutor in this connection, "but what that boy has told things to other people here and there and everywhere about his father's testimony, and they knew I could ask what was said, if he did not say it, and he would have to tell the truth, but if he did not tell the truth I could put these people on the witness-stand to show that that was all a lie. But if they do not produce him, I cannot show it. Aren't you, gentlemen of the jury, and this court, entitled to that bit of evidence from this defense? . . . And why, oh, why, is not that boy of Sam Passafiume's here to tell you about that occasion in the cornfield, and that conversation in the cornfield where Sam tells this dastardly fabrication about that threat?" The foregoing remarks constituted gross misconduct on the part of the prosecutor. But, under the rule promulgated by the constitution in section 4½ of article VI thereof, as the scope of that section has been construed and applied by the higher courts of the state, the case should not be reversed therefor, since, as repeatedly declared herein, the defendant's guilt, as the record evidence as it must be

viewed and considered by a court of appeal shows, is positively established. The case of *People* v. *Smith,* 121 Cal. 355, 360, 361 [53 Pac. 802], and the recent case of *People* v. *Harris,* 80 Cal. App. 328 [251 Pac. 823], are cited by the defendant as authorities in which, so counsel declare, the misconduct of the district attorney, for which those cases were reversed, is no more glaring than the misconduct complained of here. The Smith case was decided July 1, 1898, long before section 4½ was adopted into article VI of the constitution. Down to the date of the adoption of the section of the constitution just named, the higher courts, as they were then required to do and properly so, did not sanction approval of a judgment of conviction in a criminal case in which gross errors, directly affecting the substantial rights of the accused, were committed. This course was founded upon the proposition that any material departure from the established procedure and practice in the prosecution of criminal cases would tend to, if not actually, cause a denial of the right of persons charged with and tried for public offenses of the fair and impartial trial guaranteed by the constitution and the laws of the state in such cases. It will not be denied that, in many instances, a miscarriage of justice as against society followed from that course (then necessary to be observed or followed) in the treatment of criminal cases by the higher courts. It was for that reason that the people amended the constitution so that, where an examination of the evidence and the entire record would plainly show that no miscarriage of justice would result or has resulted from any error occurring in the admission of evidence, in the giving of instructions or any misconduct of the prosecuting officer in his presentation of the case to the jury, the cause should not be reversed. The effect of the adoption of section 4½ of article VI was to abrogate the old rule that prejudice is to be presumed from any error of law, so that now, where "error is shown, it is the duty of the court to examine the evidence and ascertain from such examination whether the error did or did not, in fact, work an injury. The mere fact of error does not make out a *prima facie* case for reversal which must be overcome by a clear showing that no injury could have resulted." (*People* v. *O'Bryan,* 165 Cal. 55, 56 [130 Pac. 1042, 1046].) The opinion in the case of *People* v. *Harris*

was handed down and filed December 16, 1926. In that case, the defendant was accused of selling intoxicating liquors contrary to the mandates of the Wright Act. The defendant "was a deputy sheriff, running a lunch room in Topango Canyon, in the County of Los Angeles." The district attorney, in his argument to the jury, commented upon the fact that the defendant did not call as witnesses the sheriff and certain deputies to testify to his good character. "Exception was taken to the argument, but the court stated it to be within the bounds of argument and did not advise the jury." The trial court later instructed the jury that if they believed "from the evidence beyond a reasonable doubt that the defendant is guilty, then you should so find, notwithstanding proof of his good general reputation as a peaceable and law-abiding citizen." The appellate court held that that instruction involved error, citing *People* v. *Ashe,* 44 Cal. 288, quoting from *State* v. *Henry,* 50 N. C. 65. The appellate court, referring to those assignments, said: "We have carefully examined the transcript of the testimony, and, while from that reading, unaided by the opportunity to judge of the credibility of the witnesses by seeing and hearing them, we are inclined to the belief that the defendant may have sold the liquor, we cannot say that there is no reasonable doubt upon the subject."

It is to be noted that a distinction exists between the Harris case and this, in that in the first named the trial court declared to the jury that the comments of the district attorney on the failure of the defendant to call the officers named to testify to his good character constituted a proper subject of argument by the district attorney, while the trial court in this case made no remarks concerning the district attorney's criticism of the defense in not calling Passafiume's son to the stand as a witness to corroborate his father's testimony of the conversation referred to. The court's statement in its instruction in the Harris case that the district attorney's argument in the respect mentioned was legally proper may well be assumed to have exerted no little influence upon the minds of the jury in the connection with which the statement was made. In this case, no objection or exception to the district attorney's remarks having been made by counsel for the defense, the court

expressed no opinion as to the propriety or impropriety thereof. As a matter of common sense, it is known that juries, always composed of laymen unfamiliar with the technical rules designed to guide the trial of a case, until, in proper instances, such rules are explained to them by the court, are ever alert to catch from the judge, learned in the law and who sits as the nonpartisan director of the trial, some intimation that will give them a cue as to what he (the judge) thinks of the merits of the case and will readily accept, as they must, for the particular case, the court's suggestion or ruling affirming the materiality and relevancy of the evidence offered. Hence, in the Harris case, the weight of the judge's opinion as to the right of the district attorney to make a point of the fact that the defendant, by failing to call the officers named to support his case by testifying that he was a man of good general reputation as a law-abiding citizen, must have exercised a potent influence on the jury against the accused or his defence. In connection with the consideration of the instant assignment, we may, even at the expense, more or less, of repetition, pertinently emphasize the fact that the main witness for the people in this case (Mr. Koons)—in fact, the only direct witness to the tragedy other than the accused himself—was wholly a disinterested party in the case, so far as he was individually concerned. There was no motive or partisanship in him for or against either the state or the defendant. He had known the deceased for about three weeks only, during which period he had met him but three or four times, one of those occasions being the day of the tragedy, and had never seen nor met the defendant until the day and at the time of the slaying of the deceased. It may from these facts be confidently assumed that Mr. Koons absolutely had or entertained no degree of friendship for the deceased or any feeling of animosity or hostility towards the accused or any attitude of mind with reference to the case that would induce him to tell anything but a straight story of the circumstances leading to and immediately attending and following the fatal combat as he saw it. And he was positive as to all the facts to which he testified. His testimony was not impeached, nor was there any serious effort to impeach it. His testimony alone, the jury believing it, was sufficient to justify a ver-

dict of conviction. That the defendant held in his breast a feeling of malice not only against the deceased, but also against the latter's wife, was shown by his (Koons') testimony, and that of the deceased's daughter and widow, to the effect that, after slaying his brother, the defendant, on seeing the widow of the deceased, drew his pistol from his pocket, in which he had deposited it immediately after the shooting, but only on the urgent importunity of Koons, and threatened to kill the widow of deceased, even cursing her, and following her as she, in a state of fear, fled hastily and in quest of a place of safety. Again, the defendant's testimony that, while he and the deceased were on the ground, clutching and fighting and viciously biting each other, first one on top and then the other, he saw in and took from the left hand of the deceased the pistol he (the defendant) used in taking his brother's life, might well have been regarded by the jury, as presumptively they did so regard it, as a pure fabrication. The deceased was "right-handed," according to the testimony of his widow, and it is more than probable that if, at the time they were fighting, he had had on his person a pistol, the weapon would have been carried on his right side, where he the more conveniently could have taken it from his pocket, particularly under the condition in which the fight was being waged. Koons said that he saw no weapon on the person of the deceased while he (Koons) and deceased were together engaged for several hours in the barn in crushing grapes; that he saw no weapon of any kind until he saw the pistol in defendant's hand instantly after the shooting. The deputy coroner, living at Orland, a short distance from the scene of the tragedy, who was there within a brief time after the tragedy was enacted, testified that he found no pistol or other weapon upon the person of the deceased or in the barn. The sheriff and a deputy, who were at the scene of the homicide a few hours after it occurred, especially searched for a weapon and found none at the premises of the deceased. The widow testified that her husband never owned a pistol. The pistol found at defendant's home corresponded in description with that with which the shooting was done. From these and other circumstances, it was a reasonable theory which the district attorney presented in his argument that defendant, before

leaving for the river, after the shooting, stopped at his home and left his pistol with his family. The jury could have reasonably adopted, and no doubt did adopt that theory of the defendant's disposal of the weapon. This recapitulation and analysis of some of the evidence presented by the people is to show that, as to the facts, there is no analogy between this and the case of the *People* v. *Harris, supra.* Again, it is to be noted that, unlike the action of the court in that respect in the Harris case, the court in this case gave to the jury a clearly expressed and a correct instruction on the character testimony and the part such testimony, when relevant, is designed and entitled legally to play in the jury's deliberations in a criminal case.

Finally, in the present connection, it may be suggested that, while the conclusion that the judgment and the order should be permitted to stand is based, so far as the misconduct of the district attorney above reviewed is concerned, upon the conviction following from an examination of the entire evidence in the case that a miscarriage of justice has not resulted from such misconduct, yet the fact may, nevertheless, be noted that the attorneys for the defendant at no time interposed an exception to the objectionable remarks of the district attorney or assigned the same as misconduct, so that the court would have been afforded an opportunity to admonish that officer to refrain from employing such an argument and to instruct the jury to pay no heed to the remarks. Some of the remarks above quoted herein would not be reviewable unless such an exception had been taken thereto, while some of them, particularly the last considered, might be held to be intrinsically so objectionable as to require no specific objection thereto to justify a review thereof. (*People* v. *Derwae,* 155 Cal. 592 [102 Pac. 266]; *People* v. *McDonald,* 167 Cal. 545, 551 [140 Pac. 256].)

5. The last assignment to be considered is the alleged misconduct of the foreman of the trial jury after the case had finally been submitted to that body for deliberation. This point was urged on the one hand and resisted on the other upon affidavits. R. M. Rankin, attorney for the defendant, deposed that the room in the courthouse of the county of Glenn, to which the jury retired to consider the case after it was submitted to them, adjoins the court-

room in said courthouse; that the jury retired for deliberation upon the case about 6:30 P. M. on December 20, 1926, and that affiant, while said jury were engaged in such deliberation, was in the courtroom from 9:50 P. M. of said day, and continuously remained there until the jury returned their verdict to the court; that, about four minutes to 10 o'clock P. M. of said day, Chester Robinson, foreman of said jury, knocked upon and opened the door of the jury-room, "and upon the appearance at said door of Roy Heard, Sheriff of Glenn County, the said Chester Robinson said to said sheriff, in substance, as follows: 'How can we get information as to the penalties?' And said Roy Heard . . . , answered, in substance, as follows: 'You fellows have no jurisdiction except as to murder in the first degree, as stated in the instructions and verdict you have,' (meaning the form of verdict submitted by the court to the jury) and further stated, 'You will have to call the court.' The said sheriff then called the court and the officers thereof and within a few minutes thereafter the said jury announced that they had a verdict and returned the same herein."

Robinson, in his affidavit, admitted that he knocked at the door of the jury-room, that said sheriff went to the door and thereupon said Robinson, addressing the sheriff, said: "We would like to get some information about penalties," to which the sheriff replied: "You have the instructions of the court and the verdict in there which state that you have nothing to do with the penalties, except as to first degree murder, but you will have to call the court to get any information, and I will call the court." The foreman further deposed that, prior to the said episode, the jury had already voted on the question of the guilt of the defendant and had unanimously found him guilty, but, so the affidavit implies, had not determined the particular offense embraced within that charge of which he was guilty.

The foreman should not have talked to the sheriff about the penalty for the different offenses within the crime charged, but should have sent word to the court for that information, although, as to the matter of penalties, a jury have no concern, except, as the court instructed them, that in a case of murder of the first degree the matter of punishment, whether death or life imprisonment, rests in their discre-

tion, nor should the sheriff have attempted to vouchsafe an answer to the foreman's question. But we cannot perceive wherein the defendant was in the remotest degree prejudiced by the incident. The sheriff accurately repeated, in substance, what the court had said to the jury in its instructions regarding their verdict. Besides, the court, upon a consideration of the affidavits, was at liberty to find, as the affidavit of Robinson alleged, that the jury had, before the foreman had talked to the sheriff, unanimously agreed upon the proposition that the defendant was guilty of one of the three several offenses comprehended within the crime charged but not of a particular one of said offenses, and the implication from the order denying the motion for a new trial is that the court so found. In that situation, if the jury had obtained the information they were seeking through their foreman under the circumstances as explained, it would seem, since the crime of which the defendant was found guilty was the lowest, so far as punishment is concerned, of the three embraced within the crime charged, he certainly suffered no prejudice—indeed, he was favored and materially benefited.

The judgment and order are affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on August 15, 1927.